**RIDGE OIL COMPANY, INC.
and Bryan A. Woodward,
Petitioners,**

v.

**GUINN INVESTMENTS,
INC., Respondent.**

No. 02–0599.

Supreme Court of Texas.

Argued April 2, 2003.

Decided Sept. 3, 2004.

Rehearing Denied Dec. 3, 2004.

Glenn E. Johnson, Brenda L. Clayton, Kelly Hart & Hallman, P.C., Austin, Kerwin B. Stephens, Stephens & Meyers, LLP, Graham, for Petitioner.

Bill F. Bogle, Russell R. Barton, Andrew D. Sims, Harris Finley & Bogle, P.C., Fort Worth, TX, Elton M. Montgomery, Montgomery & Peavy, Graham, TX, for Respondent.

Justice OWEN delivered the opinion of the Court.

In this oil and gas case, two lessees obtained working interests under a single

lease through assignments. Guinn Investments, Inc. is the lessee as to the Guinn tract, and Ridge Oil Company, Inc. is the lessee as to the adjoining Ridge tract. Ridge shut in the only two producing wells, both located on the Ridge tract, for approximately ninety days and subsequently executed new leases with the owners of the possibility of reverter of the mineral interest in the Ridge tract. Among the numerous issues presented, we hold 1) the temporary cessation of production doctrine applies when there is more than one lessee under a single lease, 2) production permanently ceased from the Ridge tract when the new leases between Ridge and the owners of the Ridge tract became effective, 3) Guinn was not conducting operations on the lease sufficient to sustain the lease at the time production permanently ceased or thereafter, and 4) Guinn is not entitled to prevail on its claims for tortious interference, fraud, or the imposition of a constructive trust.

Because the trial court did not err in granting summary judgment for Ridge, we reverse the court of appeals' judgment[1] and render judgment for Ridge.

## I

Guinn sued Ridge and Ridge's vice president, Bryan Woodward, who was also one of its two shareholders. Guinn's pleadings sought to remove a cloud upon and quiet title to the interest it held under an oil and gas lease and sought a declaration that the lease was valid. In the alternative, Guinn sought damages and a constructive trust.

Guinn and Ridge were both lessees under a 1937 oil and gas lease. The lease covered two adjoining 160–acre tracts, which we will call the Guinn tract and the Ridge tract for ease of reference. Through various assignments, Guinn became a partial assignee under the lease, obtaining the lessee's rights and obligations with respect to the 160–acre Guinn tract. Through other assignments, Ridge also became a partial assignee, obtaining the lessee's rights and obligations with respect to the 160–acre Ridge tract. Although the record is not entirely clear, the parties agree that the possibility of reverter of the mineral interest in each tract has become separate as well. The successors to the lessor's interest in the Guinn tract have no interest in the Ridge tract, and the successors to the lessor's interest in the Ridge tract have no interest in the Guinn tract. Ridge's brief asserts that both the working interests and the mineral estates with regard to the two tracts have been "partitioned," and Guinn does not dispute that. As the court of appeals noted, "It is undisputed that Ridge Oil's lessors were not the lessors of the Guinn tract."[2] None of the lessors are parties to this suit, with the exception of Ridge, who obtained a percentage of the possibility of reverter of the mineral estate on the Ridge tract.

At one time, there was a producing well on the Guinn tract, but it was plugged and abandoned in 1950. There has been production on the Ridge tract since 1937, and there were two producing wells on that tract at all times material to this dispute. The parties agree that until at least December 1, 1997, those wells sustained the 1937 lease as to both the Ridge and Guinn tracts. The habendum clause of the 1937 lease says:

> It is agreed that this lease shall remain in force for a term of five (5) years from this date, and as long thereafter as oil or gas, or either of them is produced from

1. 73 S.W.3d 523.

2. *Id.* at 535.

said land by the lessee, or as long as operations are being carried on.

Guinn acquired its interest under the 1937 lease in the summer of 1997. Shortly thereafter, Ridge offered to purchase Guinn's interest, but Guinn declined the offer. Ridge then decided that it would attempt to terminate the lease. Ridge told its pumper to cut off the electricity to the two producing wells on the Ridge tract and to perform no other activities on the premises until further notice. The electricity to the wells was cut off on December 1, 1997, and the wells ceased to produce on that date. About six weeks later, in January 1998, Ridge wrote a letter to each of the mineral interest owners of the Ridge tract. Ridge explained that production on the Ridge tract held the 1937 lease as to that tract as well as the Guinn tract and asserted that it would be very difficult to obtain an assignment of the part of the lease covering the Guinn tract because the heirs of the original lessors were "scattered across the nation." For purposes of summary judgment, Ridge did not dispute that this last statement, characterizing the owners of the leasehold interest in the Guinn tract as "scattered across the nation," was false. The letters then set forth Ridge's plan to terminate the lease and obtain new leases on both the Guinn and Ridge tracts:

> However, after consulting with my attorney regarding this matter, he has advised me of another avenue that we can take to accomplish the same desired result. He advised me to take new oil and gas leases covering only [the Ridge tract] and to simply shut the two [Ridge tract] wells in for a period of 90 days which would terminate the 1937 oil and gas lease. We could then take new oil and gas leases from the mineral owners under the [Guinn tract].

In these same letters, Ridge sent a new lease to each mineral estate owner of the Ridge tract and offered to pay a $500 bonus to each upon execution of a new lease. The letters also said that Ridge would pay $50 per month to each owner for the loss of royalty proceeds while the wells were shut in, which was the average monthly royalty paid for the last six months of production. Each of the mineral interest owners of the Ridge tract accepted this offer and executed new leases effective as of March 3, 1998. On that same date, Ridge instructed its pumper to reconnect the electricity to the wells, which he did, and the wells resumed production on that date.

On February 17, 1998, Ridge approached the owner of the largest percentage of the mineral estate on the Guinn tract, Burlington Resources, who owned a 5/6 interest in the mineral estate. Ridge offered to lease Burlington's interest, but Burlington declined.

On February 27, 1998, seventy-nine days after Ridge shut its wells in, Guinn obtained a drilling permit from the Texas Railroad Commission to drill a well on the Guinn tract. The only other evidence of activity was that Guinn attempted to pay surface damages to gain entry to drill and drove a wooden stake into the ground marking the proposed well site.

Guinn filed this suit against Ridge and Woodward on March 8, 1998, five days after the effective date of the new leases on the Ridge tract. Within a month after suit was filed, Ridge proceeded to obtain leases from some of the mineral interest owners of the Guinn tract, although Burlington Resources was not among these lessors. One lease was signed by a Guinn tract mineral interest owner on March 25, 1998, and three other Guinn tract mineral interest owners signed leases on April 1, 1998.

In Guinn's suit against Ridge and Woodward, Guinn contended that the 1937 lease had not terminated as to its tract, either because the cessation of production of the wells on the Ridge tract was temporary or because Guinn had begun operations on the Guinn tract before the lease expired and was prevented from continuing those operations by Ridge's conduct. Guinn alleged alternatively that, if the 1937 lease had terminated, Ridge had tortiously interfered with Guinn's contract rights and had committed fraud, and a constructive trust should therefore be imposed on all new leases on the Guinn tract.

Ridge and Woodward filed a motion for partial summary judgment seeking judgment in their favor on all of Guinn's claims. Guinn filed a competing motion for summary judgment. The trial court indicated that it would grant Ridge and Woodward's motion and deny Guinn's. The trial court then conducted a jury trial only on attorney's fees. Upon conclusion of that trial, the court rendered judgment that Guinn take nothing, that the 1937 lease is terminated and is no longer in force and effect, and that Ridge recover attorney's fees, although in an amount less than that found by the jury. The final judgment also awarded attorney's fees in specified amounts to Guinn in the event the judgment is reversed and it is determined that Guinn should prevail on its claims.

Guinn appealed the take-nothing judgment against it, and Ridge and Woodward appealed the amount of attorney's fees awarded by the trial court. Initially, a panel of the court of appeals affirmed the trial court. However, on rehearing en banc, the court of appeals reversed the trial court's judgment and rendered judgment for Guinn, holding that the lease had not terminated.[3] The court of appeals concluded that the temporary cessation of production doctrine applied, the cessation of production was temporary, and Ridge's surrender of its lease and the taking of new leases from the mineral interest owners on the Ridge tract did not terminate the 1937 lease as to Guinn.[4]

Ridge petitioned this Court for review, which we granted.

## II

First, we should make clear what is not at issue in this case. None of the mineral interest owners in either tract are parties to this suit, other than Ridge, who owns a portion of the mineral interest in the Ridge tract. Our determinations do not purport to adjudicate the rights of the absent mineral interest owners. The only issue among those who are parties to this suit (Guinn, Ridge, and Woodward) is whether the 1937 lease remains in effect as to the Guinn tract.

■ This Court has consistently recognized that when a lease covers more than one tract and provides, as the 1937 lease in this case provides, that it shall remain in force for a stated term and "as long thereafter as oil or gas, or either of them is produced from said land," production on any part of "said land" continues the lease in effect as to all land covered by the lease.[5] This is true even when the lessee

3. *Id.* at 537.

4. *Id.* at 531, 534, 536.

5. *Mathews v. Sun Oil Co.*, 425 S.W.2d 330, 333 (Tex.1968) (holding in a case regarding non-participatory royalty interests that "[i]t is a rule of general application that in the absence of anything in the lease to indicate a contrary intent, production on one tract will operate to perpetuate the lease as to all tracts described therein and covered thereby"); *Orive v. Sun Oil Co.*, 346 S.W.2d 383, 384 (Tex.Civ.App.-San Antonio 1961, writ ref'd) ("In the absence of anything in the lease to indicate a contrary intent, production on one

assigns interests in parts of the leased premises to different operators and there is production by only one assignee.[6] Neither Guinn nor Ridge takes issue with these principles of law.

Ridge, however, contended in its motion for summary judgment that, when production on the Ridge tract ceased on December 1, 1997, the cessation of production immediately terminated the 1937 lease in its entirety. Ridge contended alternatively that the 1937 lease terminated when it executed new leases with the owners of the possibility of reverter of the mineral inter-

est on the Ridge tract. Guinn countered that the cessation of production was only temporary, and therefore, under the temporary cessation of production doctrine, the 1937 lease did not terminate.

■ This Court has held that temporary cessation of production in paying quantities does not terminate a lease that provides it will remain in force and effect as long as oil or gas is produced.[7] In *Midwest Oil Corp. v. Winsauer*, we concluded that this doctrine likewise applies to royalty deeds,[8] and we thus said that "a tempo-

---

tract perpetuated the lease as to all the land described."); *see also Southland Royalty Co. v. O'Daniel*, 287 S.W.2d 182, 186 (Tex.Civ. App.-Eastland 1956, writ ref'd n.r.e.) (holding that production in paying quantities from either section under a lease would have prevented termination of the interest conveyed); *cf. Willson v. Superior Oil Co.*, 274 S.W.2d 947, 952 (Tex.Civ.App.-Texarkana 1954, writ ref'd n.r.e.) (under the terms of a joint operating agreement that covered two leases, production in commercial quantities on one lease kept both alive).

**6.** *See Rogers v. Ricane Enters., Inc.*, 884 S.W.2d 763, 767 (Tex.1994) ("[P]roduction from part of the lease saves the entire base lease, including the assigned portion."); *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 78 (Tex.1989) ("It is undisputed that the base lease remains in effect due to continuous production on other parts of the base lease."); *Cox v. Sinclair Gulf Oil Co.*, 265 S.W. 196, 201 (Tex.Civ.App.-Austin 1924, writ ref'd) ("The drilling of a well by any one of the assignees on his particular segregated acreage, if a producer of oil in paying quantities, was a compliance with the terms of the lease as affecting the whole tract ... and vested the right in each assignee to drill for oil on his particular acreage, even though those not drilling had taken no possession of their respective acreage theretofore." (citations omitted)); *Dacamara v. Binney*, 146 S.W.2d 440, 441 (Tex.Civ.App.-San Antonio 1940, writ dism'd judgm't cor.) (holding that there was production under the entire lease, including 720 acres that the lessee had assigned, even though there was no effort to produce on the 720-acre tract for fifteen years, because the

lease was "a unity"); *Pearson v. Black*, 120 S.W.2d 1075, 1079 (Tex.Civ.App.-Eastland 1938, no writ) ("The limitation in the lease that it should continue in force as long as any of the minerals were produced from same was in no manner modified or restricted by the assignment."); *see also Cosden Oil Co. v. Scarborough*, 55 F.2d 634, 637 (5th Cir.1932) (recognizing that a lease is indivisible even after an assignment of part of the working interest for purposes of "the requirement for the fixing of the primary term by obtaining production"); *Hillegust v. Amerada Petroleum Corp.*, 282 S.W.2d 892, 896 (Tex.Civ.App.-Beaumont 1955, writ ref'd n.r.e.) (holding production from any one of the tracts described in a lease perpetuated it and "[t]he fact that when the deeds were given in the case at bar determinable fee estates in the minerals were already vested in two different persons as a result of the leases" does not distinguish this from the usual lease situation in which "production from any one of the tracts of land described in it serves to perpetuate the lease as to all").

**7.** *Midwest Oil Corp. v. Winsauer*, 159 Tex. 560, 323 S.W.2d 944, 946 (1959); *Stuart v. Pundt*, 338 S.W.2d 167, 168 (Tex.Civ.App.-San Antonio 1960, writ ref'd).

**8.** *Winsauer*, 323 S.W.2d at 948 ("We see no reason why the same general principles of law governing the construction of oil and gas leases containing habendum clauses providing the estate conveyed shall continue after the expiration of its primary term so long as oil or gas is produced, should not be applicable to the construction of a term royalty deed containing the same or similar provisions.").

rary cessation of production in paying or commercial quantities will not cause the royalty deed to terminate" when the term of that grant was as long as oil, gas, or other minerals were produced.[9] We reached the same conclusion in *Stuart v. Pundt*, a decision from a court of appeals in which this Court refused the application for writ of error.[10] We reiterated in *Amoco Production Co. v. Braslau* that only permanent cessation of production may cause the estate to terminate.[11] More recently, we said in *Anadarko Petroleum Corp. v. Thompson* that "a typical Texas lease that lasts 'as long as oil or gas is produced' automatically terminates if actual production permanently ceases during the secondary term,"[12] citing our decision in *Amoco v. Braslau.*[13]

We agree with the court of appeals in the case before us today that, absent any language in a lease to the contrary, the temporary cessation of production doctrine applies when a lease covering more than one tract or interest is held by production from a well operated by a partial assignee of the lessee's rights.[14] As noted above, the temporary cessation of production doctrine applies to leases between original lessors and lessees[15] and to

owners of nonparticipating royalty interests.[16] It logically should apply to partial assignees of a lessee's interest as well. The central question before us today is whether there was a temporary cessation of production under the facts of this case.

## III

This and other courts have held that the temporary cessation of production doctrine applies in a wide variety of circumstances. In *Winsauer*, we held that cessation of production in paying quantities for 174 days was temporary because it was caused by two successive lawsuits and subsequently an obstruction in a gas line that required the laying of a new line.[17] In another temporary cessation of production doctrine case, *Stuart v. Pundt*, the only producing well "began to make sand, water and bottom sediment to the point where the connection was cut off and gas could not be produced."[18] Efforts to restore the well were undertaken until it was determined that the casing in the well had collapsed.[19] The lessee plugged and abandoned that well and drilled a new one.[20] The cessation of production was held to be temporary, and the new well sustained the

---

9. *Id.* at 946.

10. 338 S.W.2d at 168 (" '[A] temporary cessation of production in paying or commercial quantities will not cause the royalty deed to terminate.' " (quoting *Winsauer*, 323 S.W.2d at 946)).

11. 561 S.W.2d 805, 808 (Tex.1978) ("If there is a cessation of production after the primary term, which is not a temporary one, the estate terminates."); *see also De Benavides v. Warren*, 674 S.W.2d 353, 357 (Tex.App.-San Antonio 1984, writ ref'd n.r.e.) ("A cessation of production sufficient to terminate a term royalty interest must be a permanent cessation of production.").

12. 94 S.W.3d 550, 554 (Tex.2002).

13. 561 S.W.2d at 808.

14. 73 S.W.3d at 531.

15. *Watson v. Rochmill*, 137 Tex. 565, 155 S.W.2d 783, 784 (1941); *Stuart*, 338 S.W.2d at 168; *Campbell v. Seaman*, 427 S.W.2d 705, 708 (Tex.Civ.App.-Tyler 1968, no writ).

16. *Midwest Oil Corp. v. Winsauer*, 159 Tex. 560, 323 S.W.2d 944, 948 (1959).

17. *Id.* at 945–46.

18. 338 S.W.2d at 168.

19. *Id.*

20. *Id.*

lease.[21] In *Cobb v. Natural Gas Pipeline Company of America*, Natural was the lessee and also owned and operated the pipeline system into which a well maintaining the lease fed.[22] There were three periods of non-production at issue, nine months in 1946 to 1947, three months in 1962, and another nine months in 1974 to 1975. The well did not produce during these periods because Natural's pipeline pressure was greater than the wells' pressure.[23] After Natural added compression on the line, the well began to produce at rates higher than any in its history.[24] The United States Court of Appeals for the Fifth Circuit held that the three extended cessations of production were temporary and that the lease had not terminated.[25] In *Casey v. Western Oil & Gas, Inc.*, a well was not produced for two months after the lessee's contract with its pipeline purchaser expired and negotiations for a new contract were underway.[26] The court of appeals held that this evidence supported the trial court's finding that cessation of production was temporary and, therefore, that the lease did not terminate.[27] Accordingly, although decisions at times have said that the temporary cessation of production doctrine applies when there is "sudden stoppage of the well or some mechanical breakdown of the equipment used in connection therewith, or the like," [28] or that the doctrine applies when the cause of a cessation

of production is "necessarily unforeseen and unavoidable," [29] the circumstances in which this and other courts have applied the doctrine have not been so limited. The court of appeals in the present case correctly concluded that "foreseeability and avoidability are not essential elements of the [temporary cessation of production] doctrine." [30]

■ Ridge contends that, when it ceased production on December 1, 1997, the 1937 lease terminated as to the Ridge tract on that date. We do not reach that contention because Ridge's alternative position in its motion for summary judgment is dispositive. Ridge asserted that at least as of March 3, 1998, the date on which new leases became effective for the Ridge tract, cessation of production from the wells on the Ridge tract was permanent with respect to the 1937 lease. We agree.

■ This Court acknowledged more than a half a century ago in *Superior Oil Co. v. Dabney* that parties to an oil and gas lease may validly include a provision allowing the lessee to surrender all or part of the lease.[31] We said, "Options to surrender in contracts of lease are now regarded as valid by a practical unanimity of decision." [32] Even if an oil and gas lease does not contain a surrender clause, the parties may mutually agree to a release,[33]

---

**21.** *Id.* at 167.

**22.** 897 F.2d 1307, 1308, 1310 (5th Cir.1990).

**23.** *Id.* at 1310.

**24.** *Id.*

**25.** *Id.* at 1312.

**26.** 611 S.W.2d 676, 678 (Tex.Civ.App.-Eastland 1980, writ ref'd n.r.e.).

**27.** *Id.* at 679–80.

**28.** *Watson v. Rochmill*, 137 Tex. 565, 155 S.W.2d 783, 784 (1941).

**29.** *Scarborough v. New Domain Oil & Gas Co.*, 276 S.W. 331, 336 (Tex.Civ.App.-El Paso 1925, writ dism'd w.o.j.).

**30.** 73 S.W.3d at 532.

**31.** 147 Tex. 51, 211 S.W.2d 563, 565 (1948).

**32.** *Id.* (citations omitted).

**33.** *See Shell Oil Co. v. Stansbury*, 401 S.W.2d 623, 633 (Tex.Civ.App.-Beaumont 1966) (holding that purported releases of particular sands not authorized by the lease "could not be effective except by mutual agreement of

or they can effectively terminate their lease by signing a new one.[34] When the owners of the possibility of reverter of the mineral interest in the Ridge tract executed new leases with Ridge, they effectively terminated the 1937 lease as to that tract. Production by Ridge from the Ridge tract was thereafter performed under the new, March 3, 1998 leases, not the 1937 lease. The cessation of production from the Ridge tract under the 1937 lease thereby became permanent. Guinn had no right to enter the Ridge tract to restore or obtain production, even under the 1937 lease. Ridge and its lessors, however, could not affect Guinn and its lessors' interests under the 1937 lease, and termination of the lease as to the Ridge tract could not, in and of itself, terminate the 1937 lease as to the Guinn tract. The Guinn tract, by its terms, remained in effect "as long ... as oil or gas, or either of them is produced from said land by the lessee, or as long as operations are being carried on." The question then becomes, was there any production "by the lessee" on March 3, 1998 when the 1937 lease terminated as to the Ridge tract. The answer to that question is no. Ridge was no longer a lessee under the 1937 lease, and production by Ridge was not production "by the lessee" under the 1937 lease. Nor was there any production on the Guinn tract by the only remaining lessee, Guinn.

Guinn contends that Ridge could not "washout" its interest under the 1937 lease in this manner. We turn to that contention.

## IV

There are several decisions addressing an alleged "washout" that are instructive. In *Sasser v. Dantex Oil & Gas, Inc.*, Sasser had an overriding royalty interest under a 1974 lease in which Dantex acquired a working interest.[35] That lease had a clause permitting the lessee to unilaterally release the lease as to all or any part of the premises it covered at any time.[36] In 1990 Dantex and the owner of the reverter in the mineral interest entered into a new lease. Sasser contended that there was production in paying quantities under the 1974 lease when Dantex executed the new lease, and therefore, that the 1974 lease and consequently his overriding royalty interest were not extinguished. The court of appeals disagreed, holding that "the 1974 Lease terminated when Dantex [and the owner of the possibility of reverter] signed the 1990 Lease with the intent and understanding that, by doing so, they would effect a release of the 1974 Lease."[37] It was "not material," the court reasoned, that there was production in paying quantities.[38] "Dantex and [the owner] effected a release of the 1974 Lease by signing the 1990 Lease—regardless of whether there was production in paying quantities."[39] Sasser contended

the [lessee and lessors]"), *writ ref'd n.r.e*, 410 S.W.2d 187 (Tex.1966).

34. *See Sasser v. Dantex Oil & Gas, Inc.*, 906 S.W.2d 599, 603 (Tex.App.-San Antonio 1995, writ denied) ("We ... hold that, by signing a new lease with the intent to terminate a prior lease, a lessor waives strict compliance with a surrender clause and effectively terminates or releases the prior lease.").

35. *Id.* at 601.

36. *Id.*

37. *Id.* at 603.

38. *Id.* at 604.

39. *Id.* The court of appeals reiterated: "[B]oth Dantex and [the owner] desired and intended to terminate the 1974 Lease by signing the 1990 Lease if termination had not already been accomplished by virtue of the lack of production in paying quantities, and both Dantex and [the owner] signed the 1990 Lease with that understanding." *Id.*

that Dantex could not "washout" his overriding royalty interest this way, arguing that " 'evolving principles of Texas law' mandate the conclusion that an oil and gas lessee owes an overriding royalty interest owner a duty of good faith not to engage in intentional acts designed to eliminate or 'washout' the overriding royalty interest owner."[40] Sasser contended that Dantex's termination of the 1974 lease was in bad faith. The court of appeals rejected these contentions, reasoning that Dantex's actions would have been in bad faith only if its contractual right to surrender the 1974 Lease were subject to a duty to act in good faith, and that it was immaterial how the lease was terminated, so long as the termination of the lease was contractually permitted.[41]

In another overriding royalty interest case, *Keese v. Continental Pipe Line Co.*, the United States Court of Appeals for the Fifth Circuit held the lessees, as "remote assignees in the leasehold chain of title, were under no obligation to plaintiffs [the overriding royalty interest holders] to drill or to continue to hold on to the lease, and the facts set out in plaintiffs' affidavit, that they knew or might have known that a good well could be brought in on the property, could not have prevented them from surrendering the lease to the landowners for any reason or for no reason at all."[42] The lessees "had a clear and absolute right to release the Mills 1939 lease."[43]

Other decisions recognize, in the overriding royalty context, that a lessee may terminate a lease and extinguish the overriding royalty interest, at least when the lease has an express surrender clause.[44] In *In re GHR Energy Corp.*, the overriding royalty agreement provided that the royalty would "extend to and include each and every renewal or extension of an oil and gas lease covered by this Assignment."[45] The agreement also provided that "operations, if any, . . . and the extent and duration thereof, as well as the preservation of such lease by rental payments or otherwise, shall be solely at the will [of the lessee]."[46] The lessee terminated the lease at issue, even though production was prolific and ongoing, under a clause in the lease that permitted it to surrender the lease at any time.[47] The lessee then entered into new leases, thereby cutting off the overriding royalty owner's interest. The United States Court of Appeals for the Fifth Circuit held that the lessee "was free to terminate the leasehold estate, where the lease language expressly authorized the surrender, and to cut off [the] overriding royalties, despite the fact that gas production never ceased on the leasehold."[48] On rehearing, the court noted, "We might well reach a different result if the facts here had suggested that [the lessee] surrendered its interest in the lease to destroy the rights of the overriding royalty interest owner."[49]

40. *Id.* at 605–06.

41. *Id.* at 607.

42. 235 F.2d 386, 389 (5th Cir.1956).

43. *Id.*

44. *See Fain & McGaha v. Biesel*, 331 S.W.2d 346, 348 (Tex.Civ.App.-Fort Worth 1960, writ ref'd n.r.e.) (holding that overriding royalty interest terminated when lessee surrendered the lease and the lease had an express release provision).

45. 972 F.2d 96, 99 (5th Cir.1992).

46. *Id.*

47. *Id.* at 100.

48. *Id.*

49. *In re GHR Energy Corp.*, 979 F.2d 40, 41 (5th Cir.1992).

■ Guinn contends that we should hold that a lessee cannot surrender or terminate a lease to destroy the rights of another partial assignee of the lessee's interest. We decline to adopt such a blanket rule of law. Even if such a rule of law might be appropriate in the context of overriding royalty interests when the underlying lease does not contain an express release provision, a question we do not address, there is a material distinction between an overriding royalty interest and that of a lessee. An overriding royalty interest is a non-participating interest. A royalty owner has no right and thus no ability to go onto the underlying property and drill or otherwise take action to perpetuate a lease. An overriding royalty interest owner is wholly dependent on the lessee to keep a lease alive. That is not true of a lessee. A lessee in Guinn's position could continue a lease in effect by drilling a well and obtaining production, or continuing operations until production is obtained, under lease provisions like those in the 1937 lease.

■ In the case before us today, Ridge was a partial assignee and had no rights or obligations with regard to any tract other than the Ridge tract. Ridge owed no duty to the owners of the possibility of reverter of the mineral interest in the Guinn tract to continue the 1937 lease in effect. Nor did Ridge owe any duty to Guinn, the assignee of the working interest in the Guinn tract, to continue the 1937 lease in effect. The owners of the Ridge tract and the working interest owner of the Ridge tract were free to mutually agree to terminate the 1937 lease as to their respective interests. It is immaterial that a collateral effect of that agreement was that the only producing wells permanently ceased to be produced "by a lessee" under the 1937 lease, and because there was no other production on the lands described in the 1937 lease, that lease terminated by its own terms.

Guinn points to the court of appeals' decision in *Cain v. Neumann*,[50] on which the court of appeals in the case before us today relied.[51] In *Cain*, the owner of the mineral estate in 3,100 acres of land executed a lease covering "all of the oil, gas, coal and other minerals."[52] Through various assignments, Columbia Southern became the assignee of the right to mine for salt on a 640–acre tract out of the larger tract.[53] Others held the right to explore for and produce oil, gas, and other minerals. Columbia Southern later acquired all the rights to mine salt from the other lessees with respect to the entire 3,100–acre tract. For many years before suit was filed, salt production on the 640–acre tract was the only production sustaining the base lease on the 3,100–acre tract.[54] There was no production of oil, gas or any mineral other than salt. Columbia Southern did not cease producing salt, but it executed a release of all its interest, which the successors to the original lessors (the owners of the possibility of reverter in all the oil, gas and other minerals) accepted.[55] The owners contemporaneously executed a new lease with Columbia Southern covering uranium, vanadium, thorium and other fissionable minerals.[56] The lessees holding the oil, gas and other mineral rights under

---

50. 316 S.W.2d 915 (Tex.Civ.App.-San Antonio 1958, no writ).

51. 73 S.W.3d at 535–36.

52. *Cain*, 316 S.W.2d at 917.

53. *Id.*

54. *Id.* at 917–18.

55. *Id.* at 918.

56. *Id.* at 921.

the original lease sued, contending that the original base lease had not terminated. A divided court of appeals agreed. The court of appeals concluded that, as long as there was production of minerals anywhere on the 3,100–acre tract, the base lease remained alive, regardless of who owned the production.[57] The habendum clause in the lease said that the lease remained in effect twenty-five years after oil or other minerals in paying quantities was discovered "and as much longer as oil, gas or other minerals can be produced in paying quantities thereon."[58] The court of appeals said,

> The happening of the determining event, the cessation of production, expressed in the 1918 lease, was not tied to nor dependent upon who in the future would own the production.... [W]e find that the 1918 base lease declares that continued production of a mineral, without regard to who owns the mineral, on the 3,100–acre tract maintains the base lease in force.[59]

The court of appeals also held that Columbia's release could not affect the right of others "so long as production in fact continues."[60] The dissent in *Cain* would have held that an "assignee has a perfect legal right to surrender its part of the lease, and appellants have not shown themselves to have any right to set it aside, especially since the surrender was accomplished with the consent of the original lessor," and there was no production on the part of the lease that was not surrendered.[61]

*Cain* was decided by the San Antonio court of appeals, and that court has questioned *Cain's* continued validity in light of this Court's decision in *Sunac Petroleum Corp. v. Parkes* upholding a washout transaction.[62] The United States Court of Appeals for the Fifth Circuit distinguished *Cain* in *GHR* on the basis that the lease at issue in *GHR* contained an express surrender clause, but the lease in *Cain* did not.[63] We need not resolve today whether *Cain* was correctly decided. Its holding was that the particular habendum clause in that case—"as much longer as oil, gas or other mineral can be produced in paying quantities *thereon* "—meant that production on the leased premises, regardless of who owned the production, maintained the lease in effect.[64] The lease provisions in the case before us today are different from those in *Cain*. The lease says,

> It is agreed that this lease shall remain in force for a term of five (5) years from this date, and as long thereafter as oil or gas, or either of them is produced from said land *by the lessee*, or as long as operations are being carried on.[65]

The 1937 lease provides that it remains in force and effect so long as oil or gas is produced "by the lessee." When Ridge and the owners of the possibility of reverter of the mineral interest in the Ridge tract executed new leases, Ridge ceased to be a lessee under the 1937 lease. Production by Ridge thereafter was referable to the new leases, not the 1937 lease. Guinn continued as the sole lessee under

57. *Id.* at 920.

58. *Id.* at 917.

59. *Id.* at 920.

60. *Id.* at 921.

61. *Id.* at 922–23 (Murray, C.J., dissenting).

62. *Sasser v. Dantex Oil & Gas, Inc.*, 906 S.W.2d 599, 607 (Tex.App.-San Antonio 1995, writ denied) (citing *Sunac Petroleum Corp. v. Parkes*, 416 S.W.2d 798, 804 (Tex.1967)).

63. *In re GHR*, 979 F.2d 40, 41 (5th Cir.1992).

64. *Cain*, 316 S.W.2d at 917 (emphasis added).

65. Emphasis added.

the 1937 lease, but there was no production by Guinn.

Guinn contends that the 1937 lease nevertheless was maintained by operations. We turn to that argument.

## V

██ Production under the 1937 lease ceased no later than March 3, 1998, when the new leases on the Ridge tract became effective. Guinn alleged in its petition that, before that date, it had obtained a drilling permit from the Texas Railroad Commission and had conducted bulldozing at the well site on an unspecified date. The summary judgment evidence, however, shows only that a permit to drill was obtained on February 27, 1998, that sometime prior to March 4, 1998 Guinn was "attempting to pay surface damages in the course of gaining entry" to drill, and that on a date not specified, a wooden stake was driven into the ground to mark the well site. Guinn contends that it was excused by Ridge's conduct from pursuing any further operations and, therefore, that the 1937 lease remains in effect. We disagree.

██ The law is well-settled in Texas that "[l]essors who ... wrongfully repudiate the lessees' title by unqualified notice that the leases are forfeited or have terminated cannot complain if the latter suspend operations under the contract pending a determination of the controversy and will not be allowed to profit by their own wrong." [66] A lessor's repudiation of a lease relieves the lessee "from any obligation to conduct any operations, drilling, re-working, or otherwise, on said land in order to maintain the lease in force pending the judicial determination of the controversy ... over the validity of the lease." [67]

However, Ridge is not Guinn's lessor. No action taken by Ridge with regard to the Ridge tract or the Ridge tract lessors had any impact on Guinn's ability to commence or maintain operations on the Guinn tract. Accordingly, the fact that new leases were executed on the Ridge tract had no effect whatsoever on Guinn's ability to conduct operations on the Guinn tract or the 1937 lease provision that it would remain in effect only "as long as operations are being carried on."

Ridge did not claim any interest in the Guinn tract adverse to Guinn until Ridge took an oil and gas lease from one of the lessors of the Guinn tract. The earliest date that Ridge did so was March 25, 1998. None of the lessors of the Guinn tract took any action that cast Guinn's title into doubt or would have justified cessation of operations until March 25, 1998, when the first of four lessors signed a new lease covering the Guinn tract with Ridge as the lessee.

Guinn points to this litigation. But it was Guinn who instituted suit on March 8, 1998. None of Guinn's lessors were a party to it. When suit was filed, none of Guinn's lessors had taken any action to repudiate the 1937 lease, nor had they

---

66. *Kothmann v. Boley,* 158 Tex. 56, 308 S.W.2d 1, 4 (1957).

67. *Morgan v. Fox,* 536 S.W.2d 644, 650 (Tex. Civ.App.-Corpus Christi 1976, writ ref'd n.r.e.); *see also Labbe v. Carr,* 385 S.W.2d 592, 597 (Tex.Civ.App.-Eastland 1964, writ ref'd n.r.e.) (" ' "It is well settled that when a lessor determines to forfeit or cancel an oil and gas lease, and puts the lessee on notice thereof, he cannot complain if the latter suspends operations under the contract, pending the determination of the asserted right of the lessor to forfeit or cancel." ' ") (quoting *Wisdom v. Minchen,* 154 S.W.2d 330, 334 (Tex. Civ.App.-Galveston 1941, writ ref'd) (quoting *Morgan v. Houston Oil Co. of Tex.,* 84 S.W.2d 312, 314 (Tex.Civ.App.-San Antonio 1935, no writ))).

taken any action to prevent or interfere with operations on the Guinn tract. There was no impediment to operations as to the Guinn tract when Guinn filed suit.

■ We therefore must consider what operations were conducted between March 3, 1998, the date production permanently ceased under the 1937 lease, and March 28, 1998, the date Guinn's interest in the 1937 lease was first repudiated and Ridge made an adverse claim in the Guinn tract. Ridge presented summary judgment evidence that there were no operations during this time. Guinn did not present any evidence to the contrary. There is no evidence in the record that any activity or "operations" took place on the Guinn tract for this twenty-five day interval. Even assuming that the stake was driven into the well site during this interval, and taking into account the fact that Guinn obtained a drilling permit on February 28, 1998, and was attempting to pay surface damages, this does not raise a fact question as to whether "operations were being carried on" sufficient to sustain the lease.

The only case we have found construing the precise language before us is *Pardue v. Mark.*[68] The court of appeals noted that,

in examining the lapse of time between discontinuance of operations at the site of a first hole and commencement of drilling at the second site, "the question is one of reasonable diligence of operations." [69] The operator in that case "skidded his rig and moved the tools and immediately began the drilling of the second" well.[70] No such facts exist in the case presently before us.

In another case, the lease provided that it would remain in force at the end of the primary term if the "lessee is then engaged in drilling for oil and gas" and "so long as drilling operations are being continuously prosecuted on the leased premises." [71] The court of appeals held this provision had been satisfied as a matter of law when the lessee went onto the property with a bulldozer nine days before the primary term expired and there was "continuous work" thereafter until a producing well was completed.[72] There are a number of other cases that have concluded that particular activities satisfied the particular lease provisions at issue, but in each of those cases, there was considerably more activity towards obtaining production than that undertaken by Guinn.[73]

68. 279 S.W.2d 594, 595 (Tex.Civ.App.-Fort Worth 1955, no writ).

69. *Id.* at 596.

70. *Id.*

71. *Whelan v. R. Lacy Inc.*, 251 S.W.2d 175, 176 (Tex.Civ.App.-Texarkana 1952, writ ref'd n.r.e.).

72. *Id.*

73. *See Utley v. Marathon Oil Co.*, 31 S.W.3d 274, 275, 278–79 (Tex.App.-Waco 2000, no pet.) (lease required operations for drilling, mining or reworking or additional operations to be commenced or prosecuted with no cessation of more than ninety consecutive days and pipeline leading to the well was being constructed during disputed time and "there were activities testing and trying to obtain production from ... a 'wildcat' well"); *Petersen v. Robinson Oil & Gas Co.*, 356 S.W.2d 217, 219 (Tex.Civ.App.-Houston 1962, no writ) (court recounted activities each day, including driving a stake and leveling with a maintainer one day, more maintainer work the next two days, use of a caterpillar the following day, constructing a road each of the next several days, and moving a drill onto the location, continuing work on the rig and drilling without interruption when lease required drilling or reworking operations with no cessation of more than sixty consecutive days); *Morrison v. Swaim*, 220 S.W.2d 493, 494–96 (Tex.Civ.App.-Eastland 1949, writ ref'd n.r.e.) (detailing work done each day after expiration of the primary term on well drilled before end of primary term under a lease that remained in effect after the primary term as long "as the lessee in good faith shall conduct drilling operations thereon and should production re-

Other cases have held that the lessee's activities did not sustain a lease under each particular lease's provisions. In *Gulf Oil Corp. v. Reid*, a decision of this Court, a well was commenced before the expiration of the primary term, completed after the end of the primary term, and then shut-in while the lessee negotiated a gas purchase contract.[74] The lease provided that it would continue beyond the primary term "as long as drilling or reworking operations are being conducted on said land."[75] This Court held that negotiations after the primary term expired were "not . . . any manual operations on the part of the lessee" and that the term " 'operations' cannot be extended to include a search on the part of the lessee for a market or to secure a purchaser."[76] Similarly, in *Hickey v. Spangler*, the lease was to remain in effect after the primary term as long as drilling or reworking was prosecuted with no cessation of more than sixty consecutive days.[77] A well was begun within the primary term and completed thereafter, but was then shut in. The court of appeals held that flaring the well and sales con-

tract and other negotiations did not constitute either drilling or reworking.[78] In *Hall v. McWilliams*, the court of appeals held that starting the motor on a well once a week and pumping the well for about five minutes to pass fluid by the pump to keep it from sticking were not "reworking operations."[79] In *Forney v. Ward*, the lease terminated "[i]n case no well is begun and prosecuted with due diligence within four months."[80] Two days before the end of the four-month period, the lessee brought a load of lumber onto the premises which he intended to use to build a derrick. The day after the four-month period expired, he sent three wagons with more lumber, but the owner locked the gates to the premises and refused to let in the wagons. A jury found that a well was not begun, and the court of appeals affirmed, apparently concluding a jury could find no well was begun until there was "actual boring in the ground."[81] In *Stephenson v. Calliham*, the court of appeals held that after the primary term expired, "the lease period could be projected only by continuous

sult"); *Guleke v. Humble Oil & Ref. Co.*, 126 S.W.2d 38, 39, 41–42 (Tex.Civ.App.-Amarillo 1939, no writ) (lease in effect so long as drilling or reworking operations were prosecuted with no cessation of more than thirty days, and lessee made a location for the well, the next day brought to the location material for a steel tower and other material including cement and pipe, dug a slush pit and well for water, later erected the steel derrick, and did not cease work at any time until gas was produced); *Terry v. Tex. Co.*, 228 S.W. 1019, 1019–20 (Tex.Civ.App.-Fort Worth 1920, no writ) (lease required that lessee "commence to drill a test well" within eight months and within that time lessee brought timbers onto the property for erection of a derrick, as well as machinery including a boiler, commenced "rigging up" for a well the day before the eight months expired and commenced actual drilling eight days after the eight months expired); *see also Gray v. Helmerich & Payne, Inc.*, 834 S.W.2d 579, 580 (Tex.App.-Amarillo 1992, writ denied) (parties essentially agreed

that performing the first road construction and installing a cattleguard before the end of the primary term satisfied a requirement of commencement of drilling or reworking operations so that issue was not before the court).

74. 161 Tex. 51, 337 S.W.2d 267, 268 (1960).

75. *Id.* at 269 n. 1.

76. *Id.* at 272.

77. 358 S.W.2d 216, 218 (Tex.Civ.App.-Texarkana 1962, writ ref'd n.r.e.).

78. *Id.* at 219.

79. 404 S.W.2d 606, 609 (Tex.Civ.App.-Austin 1966, writ ref'd n.r.e.).

80. 25 Tex.Civ.App. 443, 444, 62 S.W. 108, 108 (Tex.Civ.App.1901, no writ).

81. *Id.* at 109.

operations, so that the moment those operations ceased from any cause, other than the act of God, the public enemy, or the government, the lease ipso facto terminated."[82] We need not decide whether *Forney* and *Stephenson* were correctly decided because the minimal activity by Guinn did not perpetuate the 1937 lease.

The 1937 lease did not contain a 30– or 60– or 90–day clause, as some leases do.[83] But we are not prepared to say that in order to sustain the 1937 lease, Guinn was required to conduct operations each and every day. Nevertheless, there was a twenty-five day period after production under the 1937 lease permanently ceased in which Guinn conducted no activities that were calculated to obtain production. Indeed, Guinn conducted no activities whatsoever. As a matter of law, this did not satisfy the "as long as operations are being carried on" provision.

## VI

 Finally, we address Guinn's contention that a constructive trust should be imposed on all new leases covering the Guinn tract, as well as Guinn's fraud and tortious interference claims. In *Sunac Petroleum Corp. v. Parkes*, this Court held that when a lease terminated by its own terms, and thus extinguished an overriding royalty interest, the overriding royalty owner was not entitled to a constructive trust.[84] The overriding royalty agreement applied to the original lease in which the royalty was reserved and "any extension or renewal thereof."[85] This Court concluded that there was no confidential relationship between the lessee and the owner of the overriding royalty that would justify a constructive trust on a new lease.[86] We similarly conclude that there is no confidential relationship between partial assignees of leasehold interests under a base lease.

The decision in *Thomas v. Warner-Quinlan Co. of Texas*, in which this Court refused the writ of error, is instructive.[87] The assignor assigned a lease to the assignee. We held that once the lease vested in the assignee after meeting the assignment's requirement that the assignee drill three wells, the assignee had no duty to drill or to reassign the lease before it expired due to lack of production.[88] When the lease did expire, we held that the assignee had "no duty to procure any renewal or extension of the first lease, although, according to the contract, had it done so, [a renewal or extension of the first lease] would have enured to the benefit" of the assignor.[89] Similarly, Ridge

---

**82.** 289 S.W. 158, 159 (Tex.Civ.App.-San Antonio 1926, no writ).

**83.** *See generally Rogers v. Osborn*, 152 Tex. 540, 261 S.W.2d 311, 313 (1953); *Wainwright v. Wainwright*, 359 S.W.2d 628, 629 (Tex.Civ. App.-Fort Worth 1962, writ ref'd n.r.e.).

**84.** 416 S.W.2d 798, 802–05 (Tex.1967).

**85.** *Id.* at 799.

**86.** *Id.* at 803–05; *see also Exploration Co. v. Vega Oil & Gas Co.*, 843 S.W.2d 123, 126–27 (Tex.App.-Houston [14th Dist.] 1992, writ denied) (holding that, even though the assignee did not give ninety-days notice to the assignor as required by the assignment that the lease

was about to expire because of non-production, the assignor was not entitled to a constructive trust when the assignee allowed the lease to expire and then executed a new lease, cutting off the assignor's interest).

**87.** 65 S.W.2d 321 (Tex.Civ.App.-Eastland 1933, writ ref'd).

**88.** *Id.* at 324.

**89.** *Id.* at 325; *see also Montgomery v. Phillips Petroleum Co.*, 49 S.W.2d 967, 971–72 (Tex. Civ.App.-Amarillo 1932, writ ref'd) (holding that "sublessees were simply exercising their [express contractual] right in failing to develop" and when the lease expired, both the

owed no duty to Guinn to perpetuate the 1937 lease or to procure its renewal or extension for Guinn. There is no basis for a constructive trust.[90]

Likewise, there is no basis for a tortious interference claim. Ridge and the lessors of the Ridge tract had the right to terminate the 1937 lease as to their interests. Nor has Guinn set forth any facts to support a fraud claim. Ridge moved for summary judgment on the basis that no representations were made to Guinn. The admittedly false representation made by Ridge was to Ridge's lessors, not to Guinn.

## VII

Ridge also appealed the portion of the trial court's judgment awarding it less attorney's fees than the jury determined were reasonable and necessary. Ridge contends that trial courts have no authority under section 37.009 of the Texas Declaratory Judgments Act[91] to make a partial award of attorney's fees in a declaratory-judgment case. Rather, Ridge says that a trial court has only two choices: to award all the attorney's fees found by the jury or none of them. Anything in between, Ridge contends, is a fact question for the jury. Because the court of appeals rendered judgment in Guinn's favor, it did not reach this issue. We conclude that the trial judge acted within his discretion in awarding Ridge only a portion of the attorney's fees the jury found to be reasonable and necessary.

The only issues determined by the jury in this case were the amount of the parties' "reasonable and necessary" attorney's fees. The jury found that Ridge had incurred $200,895.82 in attorney's fees preparing the case for trial and would incur an additional $45,000 on appeal. The jury also found that Guinn had incurred $59,500 in attorney's fees preparing the case for trial and would incur an additional $20,000 on appeal. In response to Guinn's motion asking the trial court to either deny Ridge any attorney's fees or to reduce the amount awarded, the trial court awarded Ridge $175,000 in attorney's fees through trial and $20,000 in attorney's fees for an appeal.[92] The trial court did not specify the basis for the reduction, and Ridge did not request findings of fact or conclusions of law on that issue.

In a declaratory judgment action, a court "may award ... reasonable and necessary attorney's fees as are equitable and just."[93] The reasonable and necessary requirements are questions of fact to be determined by the factfinder, but the equitable and just requirements are questions of law for the trial court to decide.[94] "Unreasonable fees cannot be awarded, even if the court believe[s] them just, but the court may conclude that it is not equi-

assignor and assignee were free to attempt to re-lease the same land).

90. *See generally In re GHR Energy Corp.*, 972 F.2d 96, 99–100 (5th Cir.1992), reh'g denied, 979 F.2d 40, 41 (5th Cir.1992); *Keese v. Cont'l Pipe Line Co.*, 235 F.2d 386, 388–89 (5th Cir.1956); *Sasser v. Dantex Oil & Gas, Inc.*, 906 S.W.2d 599, 605–07 (Tex.App.-San Antonio 1995, writ denied); *Fain & McGaha v. Biesel*, 331 S.W.2d 346, 347–48 (Tex.Civ.App.-Fort Worth 1960, writ ref'd n.r.e.).

91. TEX. CIV. PRAC. & REM. § 37.009.

92. The trial court's judgment also provided that Guinn would recover the full amount of attorney's fees found by the jury if the court's judgment in favor of Ridge was reversed on appeal.

93. TEX. CIV. PRAC. & REM. § 37.009.

94. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex.1998).

table or just to award even reasonable and necessary fees." [95]

■ Ridge nevertheless contends that a trial court's discretion over the award of attorney's fees in a declaratory judgment action does not include the discretion to reduce a jury's finding of the amount of reasonable and necessary attorney's fees. That, Ridge says, is a question of fact for the jury. We conclude that courts have the authority to award less than an amount determined by a jury to be reasonable and necessary and that this is a matter committed to the trial court's sound discretion.

■ There are times, such as this one, when the trial court determines that equity and justice preclude it from awarding the full amount of fees that the jury found to be reasonable and necessary. In this case, the trial judge necessarily concluded that it would not be equitable and just to award Ridge the full amount of attorney's fees, but that it would also be inequitable or unjust to award no attorney's fees even though the court had discretion to do so. If Ridge's interpretation of section 37.009 were correct, the trial court would be forced to close its eyes to the equities and choose between two inequitable outcomes. Such a result would contravene section 37.009's express language. Thus, we hold that Section 37.009's "as are equitable and just" language cannot reasonably be construed to mean anything other than *the extent to which* such fees are equitable and

just and, thus, authorizes an award of attorney's fees less than the amount found by a jury to be reasonable and necessary.

■ Whether it is "equitable and just" to award less than the fees found by a jury is not a fact question because the determination is not susceptible to direct proof but is rather a matter of fairness in light of all the circumstances.[96] In *Burrow v. Arce*,[97] an attorney fee forfeiture case, we were confronted with an analogous issue: whether the amount of an attorney fee forfeiture for breach of fiduciary duty is to be determined by the factfinder or the court.[98] Analogizing to the "equitable and just" determination under the Declaratory Judgment Act, we determined:

> [I]n [declaratory judgment and quantum meruit cases] the issue for the jury is the value of the attorney's reasonable and necessary services, not whether a reasonable fee thus determined should nevertheless be withheld for some reason. In declaratory judgment actions, once the jury has found the value of reasonable and necessary legal services, the court must decide whether the award would be equitable and just. In a forfeiture case the value of the legal services rendered does not, as we have explained, dictate either the availability of the remedy or amount of the forfeiture. Both decisions are inherently equitable and must thus be made by the court.[99]

95. *Id.*

96. *See State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 803–04 (Tex.1979) (explaining that in injunction proceedings, the factfinder does not determine the expediency, necessity, or propriety of equitable relief because " '[i]f submitted, the issue would evoke only a conjectural and speculative surmise which ... would not control the processes of equity' " (quoting *Alamo Title Co. v. San Antonio Bar Ass'n*, 360 S.W.2d 814, 816 (Tex.Civ.App.-

Waco 1962, writ ref'd n.r.e.))); *see also Bocquet*, 972 S.W.2d at 21 ("Matters of equity are addressed to the trial court's discretion. So is the responsibility for just decisions." (citations omitted)).

97. 997 S.W.2d 229 (Tex.1999).

98. *Id.* at 245.

99. *Id.* at 245–46.

Similarly, the amount of reasonable and necessary attorney's fees does not dictate their availability under the Declaratory Judgment Act. The trial court must decide whether it would be just and equitable to award them. Thus, the court has discretion to award some but not all the fees found reasonable and necessary by a jury.

We have previously held that a judge's decision to award or not award attorney's fees is reviewed on appeal for an abuse of discretion.[100] We likewise conclude that a decision to reduce an attorney's fee award is reviewable under the abuse of discretion standard. Because there is no indication in the record that the judge's decision was arbitrary or unreasonable, the trial court did not abuse its discretion.

\* \* \* \* \* \*

The trial court did not err in granting summary judgment for Ridge. The court of appeals' judgment is reversed and judgment is rendered for Ridge.

Justice SCHNEIDER did not participate in the decision.

---

100. *Bocquet,* 972 S.W.2d at 21.