OWEN, Circuit Judge,
concurring.
I agree with the panel majority’s conclusion that, under applicable Texas law, paragraph 5(f) of the 1944 oil and gas lease (Lease) at issue does not modify the Lease’s general habendum clause. I also *421 agree with much of the accompanying analysis. I write separately to emphasize the importance of reading the Lease as a whole in interpreting its provisions. With great respect, the panel majority focuses too narrowly on the placement of the disputed language in the Lease. It is not the location, but rather the meaning of the provision read in harmony with other portions of the Lease, which confirms that production anywhere on the leased property (or land pooled therewith) is sufficient to maintain the Lease during the secondary term under the facts before us.
I
The Lease at issue was executed in 1944. It originally covered 29,105.70 acres of contiguous and non-contiguous land. The primary term of the Lease was initially ten years, and originally, the primary term was to expire in 1954. However, the parties extended the primary term several times, the last extension occurring in an amendment executed in 1964, extending the primary term until March 10, 1969.
Under Texas law, when construing an unambiguous oil and gas lease, our “primary duty is to ascertain the parties’ intent as expressed within the lease’s four corners” and, in turn, to “give the lease’s language its plain, grammatical meaning unless doing so would clearly defeat the parties’ intentions.”[1] Moreover, “[w]e examine the entire lease and attempt to harmonize all its parts ... because we presume that the parties to a lease intend every clause to have some effect.”[2] Significantly, a lease will not be held to “impose a special limitation on the grant [of a mineral estate] unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning.”[3]
It is undisputed that paragraph 2 of the Lease contains a general habendum clause providing, upon the expiration of the primary term, for a secondary term of “as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder.” To further limit the secondary term, other portions of the Lease must do so via “clear, precise, and unequivocal” language.[4] Paragraph 5(f), considered in conjunction with the rest of that paragraph as well as other paragraphs in the Lease, does not use such language. As discussed by the panel majority,[5] we construed similar language in Glasscock v. Sinclair Prairie Oil Co. to “apply only to the primary term” in order to “assure to the lessor during that period a continuance of the rental payments with a reduction instead of a cessation thereof in the event of production or drilling under the lease.”[6] Significantly, the Supreme Court of Texas cited Glasscock’s holding with approval in Skelly Oil Co. v. Archer,[7] providing us with binding precedent on this issue of state law.[8] The lease at hand, as a whole, like the paragraph at issue in Glasscock, “first provides for the payment of a fixed sum on or before a certain date upon pain of ter *422 mination of the lease; it next provides for annual delay rentals ...; it then contains the above quoted paragraph, which provides for reduction of the rental by one dollar per acre upon each designated [unit] whereon a producing well is located.”[9]
The panel majority construes Glasscock to hold that a provision “that is embedded in a delay-rentals clause should not be read as affecting the duration of the Lease beyond the primary term.”[10] I disagree. Glasscock simply interpreted an unambiguous lease provision that, by its language, applied only to the primary term and did not “impose an additional limitation upon the determinable estate granted by the lease.”[11] Paragraph 5(f) of the Lease is properly read the same way based on Texas precedent that confirmed the propriety of Glasscock’s conclusions.
II
PEC Minerals nevertheless contends that paragraph 5 must be read to sever each drilling or spacing unit from the Lease such that production on one unit will not maintain the lease as to other units. It makes two arguments in support of this construction, one of which is foreclosed by the ease law, as discussed above, and the other of which finds no support in the Lease.
Paragraph 5 generally deals with the Lessee’s payment of fixed and delay rentals during the primary term as well as the Lessee’s duty to develop the Lease. Paragraph 5(a) provides that fixed payments were to be made at the end of each year for the first four years of the Lease. The Lease provides in paragraph 5(g) that these fixed payments were to be made even if the Lessee released or surrendered all or part of the lands covered by the Lease. With regard to delay rentals, this is an “unless” lease. If delay rentals are not paid, the lease terminates as to the acreage to which the delay rentals pertained.[12]
With regard to delay rentals, a number of scenarios are contemplated by paragraph 5, including, but not limited to, the possibilities that (1) the Lessee could defer all drilling during the primary term and maintain the Lease as to all acreage until the end of the primary term by paying the full amounts of delay rentals each year,[13] and (2) if production in paying quantities were obtained by a date specified in the Lease, delay rentals could be reduced proportionately. It is this latter possibility to which paragraph 5(f) is primarily addressed. It provides:
But anything in this lease to the contrary notwithstanding, it is agreed that *423 as additional consideration for the payment by Lessee of the said cash payment of $50,000.00 and its agreement to pay the said fixed rentals as and when due under the above provisions hereof, Lessee shall have the right, in the event it shall, prior to March 10th, 1948, drill a well on said leased premises or on acreage pooled therewith productive of oil, gas or other mineral in paying quantities, to continue this lease in force as to each of the other undeveloped drilling or spacing units “all to be selected by Lessees as soon as practicable after the completion of such well” for as long as such paying production shall continue and without being obligated to conduct drilling operations on such undeveloped units, by paying or tendering to Lessor, ... commencing on or before March 10th, 1948, and annually thereafter until the end of the said primary term of this lease, a rental of one dollar per acre for each acre contained in each such undeveloped drilling or spacing unit or fraction thereof. But the commencement by Lessee of drilling operations on any such undeveloped drilling or spacing unit shall relieve Lessee from the payment of such rental thereon, and if paying production should result from such operations this lease shall continue in force as to the drilling or spacing unit on which such production is had for as long as such production continues. It is agreed that the provisions of this sub-paragraph (f) hereof shall be separable and shall be considered and applied as a separate agreement as respects each such undeveloped or spacing unit.
Existing case law compels me to conclude that this provision does not have the effect of severing each drilling or spacing unit from the Lease and treating each as a separately leased property for all purposes such that production on one unit would fail to hold the Lease as to others, although I think that it would be a closer question if we were writing on a blank slate. In light of precedent, paragraph 5 must be read as permitting the Lessee to reduce proportionately the amount of delay rental that is owed by drilling on unproductive units or obtaining production from previously unproductive units but not creating a separate lease for each unit.
PEC Minerals argues that the language in the last sentence of paragraph 5(f) would serve no purpose unless it means that each drilling or spacing unit is treated as separately leased. That is not the case. The last sentence of paragraph 5(f) can reasonably be construed as making clear that if the Lessee begins drilling on a unit in order to eliminate the obligation to pay delay rentals for the acreage covered by that unit, the entire Lease is not forfeited or terminated if a dry hole results. In other words, this sentence could be reasonably construed to mean that if the Lessee fails to pay delay rentals attributable to a particular unit while drilling, but a dry hole then results, any contention that the Lease expired due to the non-payment of delay rentals for some period of time would affect only that unit and not the entire Lease. A similar protective provision is found in the immediately preceding subparagraph of paragraph 5 regarding development of the Lease.[14] Essentially, *424 subparagraph 5(e) requires the Lessee to designate a unit around a well once production is obtained and provides a safety net perpetuating the Lease as to each such producing unit in the event the Lease is terminated or lost as to other acreage for any reason.
PEC Minerals also argues that it is “unfair” and unreasonable to conclude that the parties contemplated that a single well could hold the entire leased acreage, which was originally 29,105.70 acres, after the primary term. This contention has a concrete answer under the terms of the Lease. As noted above, the Lessee is entitled under paragraph 5(b) to defer all drilling until virtually the last day of the primary term by paying delay rentals on all the leased acreage. If that had occurred, paragraph 6 of the Lease permits the Lease to be maintained in force and effect by drilling, and a single productive well would hold the entire acreage after the primary term:
If at any time subsequent to 60 days prior to the beginning of the last year of the primary term and prior to the discovery of oil, gas or other minerals on said lands or on acreage pooled therewith, Lessee should drill a dry hole thereon, no rental payment or operations are necessary in order to keep the lease in force during the remainder of the primary term. If at the expiration of the primary term, oil, gas or other minerals are not being produced on said land [the leased property], or on acreage pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon, or shall have completed a dry hole thereon within 60 days prior to the end of the primary term, the lease shall remain in force so long as operations are prosecuted with no cessation of more than 60 consecutive days, and if such operations result in the production of oil, gas or other mineral, so long thereafter as oil, gas or other mineral shall be produced on said lands or acreage pooled therewith.
Accordingly, although PEC Minerals’ argument that the parties did not intend for one well to hold such a large leasehold has some equitable appeal, it is refuted by the terms of the Lease.
Ill
The panel majority relies on the March 1, 1964 amendment to the Lease as supporting the Lessee’s construction of paragraph 5(f) of the original Lease. I respectfully disagree. The 1964 amendment does not clearly support either party’s position regarding paragraph 5(f).
At two junctures, the 1964 amendment says that the Lease is extended on the same terms and conditions as the original lease. However, in another provision of the 1964 amendment, the parties agreed that in consideration of recited nominal consideration and “all the mutual agreements and benefits” contained in the 1964 amendment, at the end of the extended primary term (March 1969), the Lessee would release acreage that was not “embraced in a producing unit” or drilling unit upon which operations have been commenced. The parties also agreed that the Lessee could release “any acreage under the lease on which it does not care to further explore, develop or produce” at *425 any time during the extended primary term and have no obligation to pay delay rentals on the released acreage. The panel majority says that the agreement to release non-producing acreage at the end of the primary term would be surplusage if paragraph 5(f) already terminated the Lease as to non-producing acreage at the end of the primary term. But the provision regarding the Lessee’s right to release acreage at any time during the primary term is unquestionably surplusage. The original Lease contained an express provision, in paragraph 5(d), permitting the Lessee to do precisely that.[15] I therefore cannot conclude that we must construe paragraph 5(f) of the original Lease as not requiring a release of non-producing acreage at the end of the primary term in order to avoid surplusage in the 1964 amendment since the 1964 amendment has other surplusage in it.
Nevertheless, I agree with the panel majority that under existing precedent, we cannot construe paragraph 5(f) of the original Lease as creating a separate lease for each production or drilling unit such that production on one unit will not hold the Lease as to all other units.
I concur in the judgment rendered by the panel majority but not all of the reasoning in its opinion.

. Anadarko Petroleum Corp. v. Thompson, 94 S.W.3d 550, 554 (Tex.2002) (citations omitted).

. Id. (citations omitted).

. Id. (citation omitted).

. Id. (citations omitted).

. Ante, at 8-9.

. 185 F.2d 910, 912 (5th Cir.1950).

. 163 Tex. 336, 356 S.W.2d 774, 780 (1961).

. Packard v. OCA, Inc., 624 F.3d 726, 729 (5th Cir.2010) ("In determining questions of Texas law, this court looks to the decisions of the Texas Supreme Court, which are binding.” (citation omitted)).

. 185 F.2d at 912.

. Ante, at 9.

. 185 F.2d at 912.

. See infra note 13, quoting paragraph 5(b) of the Lease; see also Holman v. Meridian Oil, Inc., 988 S.W.2d 802, 807 (Tex.App.-San Antonio 1999, pet. denied) (“It is well settled that under the terms of an 'unless' lease, the failure to begin a well or pay delay rentals, ipso facto, terminates the lessee’s interest.”).

. The Lease provides in paragraph 5(b):
If operations for drilling are not commenced on said lands, or on acreage pooled therewith as above provided, on or before March 10th, 1948, this lease shall then terminate as to both parties unless on or before said last mentioned date Lessee shall pay ... ($29,105.70), (hereinafter called “delay rental”) which shall cover the privilege of deferring the commencement of drilling operations for a period of twelve (12) months from and after said last mentioned date. In like manner and upon like payments or tenders of such delay rental, annually, the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the remainder of said 10-year primary term.

. Paragraph 5(e) provides, in pertinent part:
After the discovery of oil, gas or other minerals in paying quantities on the above-described leased premises, or on acreage pooled therewith, Lessee shall reasonably develop the acreage retained and pooled hereunder, but in discharging this obligation it shall in no event be required to drill more than one well per 640 acres of the area retained and pooled hereunder and capable of producing oil, gas or other minerals in paying quantities.... It is agreed *424 that in case of cancellation, termination, or forfeiture of this lease for any cause the discovery of such paying production shall hold and perpetuate this lease as to such a drilling or spacing unit around the well for as long as such production continues without any obligation on Lessee to conduct further drilling operations thereon, and that such unit should be selected by Lessee as promptly as practicable after such discovery of paying production.

. Paragraph 5(d) provides:
Lessee may at any time exercise and deliver to Lessor ... a release or releases covering any portion or portions of the above described lands, and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered, and thereafter the delay rental payable hereunder shall be reduced to the proportion that the acreage covered by this lease is reduced by such release or releases.
See also Ridge Oil Co. v. Guinn Invs., Inc., 148 S.W.3d 143, 152 (Tex.2004) (recognizing that Texas law allows a lessee to surrender all or part of an oil and gas lease, either under an express provision of the lease or by mutual agreement of the parties).