**ANADARKO PETROLEUM CORPORATION,**
Appellant,

v.

**TRO-X, L.P., Appellee.**

No. 08–15–00158–CV

Court of Appeals of Texas,
El Paso.

March 18, 2016

Samuel J. Stennis, Cotton, Bledsoe, Tighe & Dawson, P.C., Midland, TX, for Appellee.

Harper Estes, Derek Cook, Lynch, Chappell & Alsup P.C., Midland, TX, for Appellant.

Before McClure, C.J., Rodriguez, and Hughes, JJ.

## OPINION

YVONNE T. RODRIGUEZ, Justice

In this oil-and-gas case, we must determine whether a prime lessee retained any interest in a mineral estate after its sublessee and the lessors, following a purported breach of the prime leases' terms and allegedly unbeknownst to the prime lessee, executed new "washout" leases cutting out the prime lessee as a party.

The prime lessee argues that a thirteen-day delay between execution of the new leases and the sub-lessee's execution of a release of the old leases demonstrated that the lessors intended for the new leases to function temporarily as top leases on the original mineral estate until the transaction was fully consummated. Since the terms of the sub-lease permitted the prime lessee to revert "back in" to any top leases the sub-lessee granted, the prime lessee maintained it was entitled to a five percent working interest in the new leases. The trial court agreed and rendered judgment accordingly.

In one issue on appeal, the sub-lessee asks us to void that decision, contending that the record evidence establishes that the lessors intended to terminate and release the old leases simply by executing the new leases, and that executing and recording the separate release was an ancillary formality insufficient to support the trial court's verdict. We agree that the evidence underpinning the trial court's judgment was legally insufficient. We reverse and render a takenothing judgment.

## BACKGROUND

### Factual History

In February 2007, Lessors David E. Cooper, Hill–Cooper, Ltd., Richard W. Cooper, Kendall C. Hill, and Shirley Cooper (collectively, the Coopers) executed five oil and gas leases in Ward County, Texas, with prime Lessee TRO–X, the Ap-

pellee at bar (the 2007 Prime Leases).[1] Exhibit A to the 2007 Prime Leases contains a provision requiring TRO–X to protect against the drainage loss of oil, gas, or other hydrocarbons to oil wells completed outside of lease boundaries by drilling offset wells within lease boundaries when certain conditions are met (the Off–Set Well Provision). As is relevant here, TRO–X's duty to drill an off-set well on the leasehold would be triggered by the completion of an off-lease well within 660 feet of leasehold borders producing oil in paying quantities located. Another clause in the Off–Set Well Provision states: "If the Leased Premises should be in any field where a drilling pattern has been established by any State or Federal Government Authority having jurisdiction over such matters and such field is being drilled or developed according to a smaller or larger drilling pattern then the offset distances and the acreage to be surrendered shall be so diminished or enlarged." The Provision further states that "[i]f Lessee should fail to timely commence operations for the drilling of an offset well, then, on demand of Lessor, Lessee shall surrender this Lease as to that portion of the Leased Premises ..."

In March 2007, TRO–X executed a sublease transferring its entire Prime Lease interests, save for a limited contingent reversionary interest, to Eagle Oil & Gas Co. (the Participation Agreement).[2] Per Paragraph 4 of the Participation Agreement, once Eagle Oil broke even on its Prime Lease drilling activity and reached a project payout point, TRO–X could then exercise, at its sole discretion, a "back-in" option that would allow TRO–X to receive five percent of its original Prime Leasehold working interests back. Paragraph 9 states: "The Working Interest Back–In After Payout owned by TRO–X as described in Paragraph 4.[sic] above shall extend to and be binding upon any renewal(s), extension(s), or top lease(s)[3] taken

---

1. The legal descriptions for the five leases are:

| Date | Lease | Memorandum Recording Information |
| --- | --- | --- |
| 1/16/07 | David E. Cooper | Book 809 Pg. 725-732 of Ward County Official Records |
| 1/16/07 | Richard W. Cooper | Book 809 Pg. 733-740 of Ward County Official Records |
| 1/26/07 | Kendall C. Hill | Book 809 Pg. 741-749 of Ward County Official Records |
| 1/16/07 | Shirley Cooper | Book 809 Pg. 750-757 of Ward County Official Records |
| 1/26/07 | Hill-Cooper, Ltd | Book 809 Pg. 758-767 of Ward County Official Records |

2. The Participation Agreement is properly characterized as a sublease, rather than an assignment, which requires a lessee to execute "an instrument conveying his entire estate and interest under a lease to a subsequent lessee so that the original lessee retains no reversionary interest in the lease whatsoever." *Tawes v. Barnes*, 340 S.W.3d 419, 429 (Tex.2011). "If the transferring party retains any reversionary interest in the transferred interest, the instalment is a sublease." *Royalco Oil & Gas Corp. v. Stockhome Trading Corp.*, 361 S.W.3d 725, 731–32 (Tex.App.–Fort Worth 2012, no pet.).

3. TRO–X pleaded only that the new leases constituted top leases, not extensions or renewals of the previous leases. Both parties agree that a top lease is a contingent proprietary interest in a mineral estate "whose existence is ... triggered by the failure of the underlying original lease." *Victory Energy Corp. v. Oz Gas Corp.*, 461 S.W.3d 159, 175 (Tex.App.–El Paso 2014, pet. denied).

within one (1) year of termination of the underlying interest." Eagle Oil later assigned its full lease interests to Anadarko, which began drilling operations on the leasehold.

On November 20, 2007, the Texas Railroad Commission adopted new temporary rules governing the Phantom (Wolfcamp) Field, which encompassed the 2007 Prime Leasehold and adjacent land. *See* R.R. COMM'N OF TEX., *Adopting and Amending Rules and Regulations for the Phantom (Wolfcamp) Field Ward County, Texas*, Docket No. 08–0253661 (Oil & Gas Div. Nov. 20, 2007)(final order). Per Field Rule 2(a), "[n]o vertical well shall hereafter be drilled nearer than FOUR HUNDRED SIXTY SEVEN (467) feet to any property line, lease line or subdivision line and no vertical well shall be drilled nearer that NINE HUNDRED THIRTY THREE (933) feet to any applied for, permitted or completed vertical well in the same reservoir on the same lease, pooled unit or unitized tract." *Id.*

On November 15, 2008, Anadarko completed a well on non-leasehold land that was 550 feet from the 2007 Prime Leasehold's border. The parties dispute whether Anadarko's off-lease well fell within the 2007 Prime Lease's off-set zone in light of the Railroad Commission's intervening administrative change to drilling patterns in the Phantom (Wolfcamp) Field. In any event, it is undisputed that if the off-set provision was triggered, Anadarko failed to drill a reciprocal off-set well on leasehold land by May 15, 2009 (within 180 days), as required by the 2007 Prime Leases' terms. More than two years later, on May 25, 2011, Lessor Richard W. Cooper sent Anadarko a demand letter alleging that the Coopers had the right to terminate the 2007 Prime Leases for breach of the Off–Set Well Provision, stating "[t]his letter shall serve as the above mentioned

Demand of Release. I would appreciate your timely review and preparation of the Release of Oil and Gas Lease." Upon review, Anadarko determined that it had, in fact, breached the Off–Set Well Provision, and that Cooper's written demand automatically re-vested the leased mineral interests back with the Coopers.

Thereafter, Anadarko, represented by landman Caleb Fielder, and Jerel Hill entered into negotiations over what would eventually include all the Coopers' respective mineral interests as covered by the 2007 Leases. On June 6, 2011, Fielder sent Hill an e-mail opening negotiations, stating in relevant part:

> Jerel,
>
> Anadarko would be prepared to offer you and the other Hill/Cooper family members a new lease—on the full 640 acres—for $400 per acre, at a one year primary term. The lease would be made on a form practically identical to our existing lease. Ideally, the lease would be dated effective, on or about June 24, 2011—and we would file a release of the existing lease concurrent with the execution of the new lease[.]
>
> Stated another way, APC is offering you and your family members over $250,000 for a lease, the primary term of which would expire in June of 2012.
>
> Please discuss this with your family members and let me know your thoughts.

Hill responded to the e-mail on June 8, 2011, explaining that he did not yet have authority to negotiate for the other parties, but that he believed that if Anadarko increased their offer to $800 an acre, the other Cooper family members would be amenable to accepting the offer. Fielder, in turn, sent Hill an e-mail asking if Hill could recast his suggestion as a formal counteroffer that could be presented to

Anadarko for approval. Hill then sent Fielder the following response e-mail:

> I will give you an answer before 5. I am also assuming that the document would be an extension of the current lease so we do not have to deal with renegotiating any other point in the 2007 lease and the addendum A thereto. I believe you stated so earlier, but I just wanted to be sure.

Fielder responded, in relevant part:

> Jerel,
>
> Yes. The document would be on the same form and content as the current lease so you are correct there would not be any other renegotiating point. It would not be an 'extension' so much as a new lease (again, of the same form and content as the old) made effective this month (with a concurrent release of the old lease)[.]

Hill and Fielder continued to exchange e-mails dealing with other issues such as covered acreage and a new drilling commitment that the Coopers sought from Anadarko. Eventually, the Coopers and Anadarko reached an agreement, and on June 17, 2011, the Coopers executed new leases (the 2011 Leases) naming Anadarko as lessee with respect to all the mineral interests covered by the five original 2007 Leases. The new leases required Anadarko to pay a higher rate per acre, shortened the length of the primary term from three years to one year, and imposed a 240–day drilling commitment on Anadarko. In its

brief, TRO–X maintains that the 2011 Leases "were executed without TRO–X's knowledge or consent" and "were absent the protections TROX had in the 2007 Leases."

On June 22, 2011, Fielder instructed Anadarko employee Carolyn Holden to prepare releases for the original five 2007 Leases, stating that "[w]e are taking new leases from these lessors." On June 30, 2011, Anadarko executed a release of any interests it held on the 2007 Prime Leases (the Release Agreement). The 2011 Leases were recorded on June 30, 2011. The Release Agreement was not recorded until August 4, 2011.[4]

### Procedural History

TRO–X brought suit to try title and for breach of contract, alleging that under the terms of the Participation Agreement that bound Anadarko as assignee of predecessor-in-interest Eagle Oil, TRO–X was entitled to five percent of Anadarko's interest in the 2011 Leases. Following trial, judgment was rendered in favor of TRO–X and the trial court made findings of fact and conclusions of law, finding, inter alia, that the 2011 Leases were top leases and that TRO–X was entitled for a percent back-in under the Participation Agreement.[5] Anadarko appealed.

### DISCUSSION

The central question in this appeal is whether, standing alone, the delay be-

---

4. In its brief, Anadarko claims that its landman Caleb Fielder instructed an outside landman to record notice of the new leases and written release simultaneously, but through inadvertence, the release was not recorded for four days. Anadarko points to no direct evidence in the record that supports this assertion.

5. The Honorable Bob Parks, judge for the 143rd District Court of Ward County, presid-

ed at trial and signed the final judgment on January 22, 2015. Judge Parks died on June 18, 2015, prior to filing findings of fact in this case. The Presiding Judge of the Seventh Administrative Judicial Region then assigned the Honorable Robert H. Moore, III, senior judge of the 118th District Court, to this case. Judge Moore signed Findings of Fact and Conclusions of Law on July 24, 2015.

tween the execution of the new leases and the execution of a written release of the old leases raised more than a scintilla of evidence in support of the trial court's conclusion that the Coopers intended the 2011 Leases to be top leases that came into being only upon recording of the 2007 Leasehold release. If so, TRO–X is entitled to the five percent back-in working interest awarded by the trial court per the terms of the Participation Agreement.

We pause out the outset of this case to winnow away some side issues unnecessary to the resolution of this appeal. *See* Tex.R.App.P. 47.1. The parties devote a significant amount of briefing to the question of whether Anadarko did, in fact, breach the 2007 Prime Leases' Off–Set Well Provision and whether Richard Cooper's demand letter resulted in an automatic reversion of the mineral estate. If so, Anadarko claims, we need not even reach the issue of intent, as (1) the Coopers held title free and clear of any lessee claims related to the now-defunct 2007 Leases, (2) the Coopers were free to re-let the mineral estate directly to Anadarko as prime lessee, and (3) the break in time between the termination of 2007 Leases and the new re-let absolved Anadarko of any contractual duty to TRO–X under the Participation Agreement, since the agreement only gives TRO–X a back-in for top leases, not new leases created after a loss of title through reversion. TRO–X disputes Anadarko's version of events, insisting that Anadarko never actually breached the Off–Set Well Provision and that the 2007 Prime Leases remained in legal effect past the execution of the 2011 Leases until the parties' release agreement was recorded.

We need not answer the question of breach here. Regardless of how we resolve that question, it would be immaterial to the case's ultimate outcome. In the first place, we agree with TRO–X that even if Anadarko breached and title reverted automatically back to the Coopers, the Prime Lease only requires forfeiture of a limited amount of leasehold border acreage immediately adjacent to the non-lease well; the remainder of the leasehold interest would stay intact.[6] Because the parties seek to determine title to the *entire* mineral estate covered by the five 2011 Leases, automatic reversion for breach of a condition subsequent would not completely cleanse the 2007 mineral estates of title issues. Therefore, we would still have to determine whether the 2011 Leases created top leases on non-reverted portions of the 2007 leasehold that ultimately would trigger TRO–X's contingent interest in the Participation Agreement.

Conversely, even if, as TRO–X contends, Anadarko never actually breached the Off–Set Well Provision and the 2007 Prime Leasehold remained in effect either in whole or in part, TROX concedes that Anadarko and the Coopers could terminate all the prime leases and supplant them with new ones if the Coopers entered into the new leases "with the intent and understanding that, by doing so, they would effect a release of the [prior] Lease." *Ridge Oil Co., Inc. v. Guinn Invs., Inc.,* 148 S.W.3d 143, 153 (Tex.2004). TRO–X does not otherwise argue that the 2011 Leases are invalid for washing out TRO–X's contingent interest in the mineral estate, nor does the company assert that the Coopers and Anadarko lacked standing or capacity to enter into a new lease agree-

6. The surrender clause states: "If Lessee should fail to timely commence operations for the drilling of an offset well, then, on demand of Lessor, Lessee shall surrender this Lease as to that portion of the Leased Premises located within the applicable forty (40) or one hundred-sixty (160) acre tracts, designated by Lessor."

ment that effectively cut TRO–X out of the leasehold's chain of title without first informing TRO–X.[7] Instead, TRO–X merely asserts that the trial court correctly determined that the 2011 Leases were top leases.

In short, regardless of which path we were to take on breach, all roads ultimately converge into an inquiry surrounding the Coopers' intent at the time they executed the 2011 Leases with Anadarko with respect to the partially or wholly intact 2007 Leases. And since we conclude that TRO–X failed to raise more than a scintilla of evidence that the Coopers intended for the 2011 Leases to be top leases on whatever remained of the 2007 Leaseholds until all real estate documents were recorded, determination of the breach issue is wholly superfluous.

### Standard of Review

We interpret unambiguous texts, including mineral leases, *de novo*. *Victory Energy Corp.*, 461 S.W.3d at 172. Where a text is ambiguous and parol evidence is admitted to clarify the contours of an in-

strument's reach, we review the contract under a mixed standard. *Id.* We review the fact finder's determinations of historical fact under the legal and factual sufficiency standard. *Id.* "In a civil case, if the trial court's factual findings are unchallenged, as in this case, they are binding on the appellate court unless the contrary is established as a matter of law, or there is no evidence to support the finding." *Vernon v. Perrien*, 390 S.W.3d 47, 57 (Tex. App.–El Paso 2012, pet. denied)[Internal quotation marks omitted], "In other words, our review of unchallenged findings is restricted to whether the evidence is legally sufficient to support them." *Id.*; *cf. Marincasiu v. Drilling*, 441 S.W.3d 551, 558 (Tex.App.–El Paso 2014, pet. denied)(evaluating whether appellant adequately challenged fact-findings so as to raise factual sufficiency challenge on appeal).[8] Since Anadarko only challenges legal sufficiency, we set out only that standard here.

We sustain a legal sufficiency challenge when the trial court's decision is unsupportable as a matter of law because (1) there is "a complete absence of evi-

---

7. There are multiple Texas cases stating that a lessor and subsequent lessee may generally execute new washout leases that eliminate other parties' retained interests in old leases, since working interest holders ordinarily owe no duty to protect the interests of other working interest holders or non-participating overriding royalty interest owners absent evidence, contractual or factual, of a specific fiduciary relationship between those parties. *See Stroud Production, L.L.C. v. Hosford*, 405 S.W.3d 794, 804–06 (Tex.App.–Houston [1st Dist.] 2013, pet. denied)(discussing Texas Supreme Court cases in which parties execute new leases that exclude holders of a reversionary interest); *see also Ridge Oil Co., Inc.*, 148 S.W.3d at 147–48, 155 (where lessor divided base lease into two tracts with two lessees, and eventual lessee on one tract was not producing oil, other lessee could deliberately breach base lease by ceasing production on its tract, force termination and reversion of both tracts to lessor, and then re-lease both

tracts of the mineral estate from lessor without incurring liability to former co-tenant); *Sasser v. Dantex Oil & Gas, Inc.*, 906 S.W.2d 599, 603–05 (Tex.App.–San Antonio 1995, writ denied)(affirming summary judgment against overriding royalty interest holder where lessor and lessee with 75 percent working interest executed a new superseding lease that cut out royalty interest holder).

8. In its brief, TRO–X notes that Anadarko did not specifically challenge the trial court's findings of fact. Assuming without deciding TRO–X is correct, this fact is of no legal consequence here, since Anadarko brings only a legal sufficiency challenge on appeal. Failure to challenge a specific finding of fact is only a relevant consideration when an appellant brings a *factual* sufficiency challenge. *Marincasiu*, 441 S.W.3d at 558; *Vernon*, 390 S.W.3d at 57.

dence of a vital fact," (2) "the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact," (3) there is "no more than a mere scintilla" of evidence proving a vital fact, or (4) the evidence conclusively establishes the opposite proposition of a plaintiff's proffered vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). We view evidence in the light most favorable to the ruling on a legal sufficiency challenge, indulging "every reasonable inference" in the trial court's favor. *El Paso Indep. Sch. Dist. v. Pabon*, 214 S.W.3d 37, 41 (Tex.App.–El Paso 2006, no pet.). "Any evidence of probative force supporting a finding requires us to uphold" the trial court's ruling. *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). Where an outcome-determinative interpretation of evidence falls within the zone of reasonable disagreement, we are without power to disturb the verdict or decision on legal sufficiency grounds. *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 758 (Tex.App.–Dallas 2008, no pet.).

### Analysis

■ The Court's resolution of Anadarko's liability under the Participation Agreement hinges on what the Coopers intended to do when they signed the 2011 Leases: Did they intend to terminate whatever remained of the 2007 Leases at the moment the new leases were executed, or did they want to keep the 2007 Leases intact as a failsafe until obtaining a release from Anadarko at the close of the transaction? *See Ridge Oil Co.*, 148 S.W.3d at 153.

TRO–X urges us to infer that the mere existence of an after-the-fact executed written release creates a fact issue at to the parties' intent. Anadarko insists the Release Agreement was merely ancillary to the 2011 transaction and that no top

lease ever formed in fact because the Coopers intended for execution of the 2011 Leases to extinguish the 2007 Prime Lease at the moment of execution. On this record, we find that the mere execution and recording of a release agreement after execution of the new leases is not legally sufficient evidence that the Coopers intended for the leases to function as top leases until the release was executed and recorded.

Although not precisely on point, *Sasser v. Dantex Oil & Gas, Inc.*, 906 S.W.2d 599, 603–05 (Tex.App.–San Antonio 1995, writ denied), is instructive on how much value the Court should place on a written release here. In *Sasser*, the overriding royalty interest holder whose interest in an old lease was washed out argued that the new lease never became effective because Dantex, the working interest holder, failed to strictly comply with the old lease's surrender clause by offering the lessor a written release. The San Antonio Court of Appeals disagreed, holding that "by signing a new lease with the intent to terminate a prior lease, a lessor waives strict compliance with a surrender clause and effectively terminates or releases the prior lease." *Sasser*, 906 S.W.2d at 603.

*Sasser* makes clear that the presence or absence of a written release is not outcome-determinative; we must focus on the lessor's intent at the time the lease was executed, as a lessor is deemed to have waived any formal surrender requirements if it signs a new lease with the intent to terminate the old one. *Id.* Under the legal sufficiency standard, TRO–X, as plaintiff in the court below, bears the burden of raising more than a scintilla of evidence in support of its claim that the Coopers intended for the execution and recording of the written release to be the event that terminated the 2007 Leases once and for all. TRO–X cannot do so here.

"[A] jury may not reasonably infer an ultimate fact from meager circumstantial evidence which could give rise to any number of inferences, none more probable than another." *Hancock v. Variyam,* 400 S.W.3d 59, 70–1 (Tex.2013)[Citation and internal quotation marks omitted]. There is no evidence in the record suggesting that the Coopers placed any particular emphasis on the execution of a separate release that would make the executed 2011 Leases effective. Rather, TRO–X asks us to infer the Coopers' intent based solely on the release that Anadarko executed. That inference is no more probable than the ancillary formality inference Anadarko advances in light of the scant record before us.

The e-mails in the record show that it was Anadarko who proposed and executed the releases on its own initiative; Jerel Hill never mentioned or even *requested* any separate releases. Fielder also explained to Hill during negotiations that Anadarko was not requesting an extension of the 2007 Leases, but was instead proposing new leases covering the same mineral estate on different terms. Hill never took issue with Fielder's characterization of the leases as being new, never objected to Fielder's proposal that the new leases and the release of the old leases go into effect simultaneously, and never voiced any other wishes to structure that transaction using top leases as legal scaffolding around the deconstruction of the old leases. Instead, Hill focused in on a new price point and new drilling terms. Finally, TRO–X does not point to any language in the 2011 Leases executed by the Coopers that would suggest the leases would not be effective absent a written release from Anadarko. Nothing in the interaction between the parties or in the trial testimony suggests the Coopers intended for the 2011 Leases to be top leases that would come into effect only upon execution of a release.

TRO–X also argues that we can infer that the Coopers intended for the 2011 Leases to function as top leases on the 2007 Leases at the time the new leases were executed precisely because the title situation vis-à-vis the mineral estate was unclear to all the parties involved. In other words, because the Coopers likely believed that the 2007 Leases had already elapsed, they could not have executed the 2011 Leases with the specific intent to terminate the 2007 Leases, and since the Coopers lacked the intent to terminate the 2007 Leases, those leases remained in existence as a matter of law until Anadarko executed the releases. Assuming without deciding that the Coopers' belief that they were signing new leases on a mineral estate they held free and clear would not result in termination of what remained of the old leases, again, the record evidence is insufficient to support the inference TRO–X advances. *Hancock,* 400 S.W.3d at 70–71. TRO–X cites no case law in support of this legal proposition, and it merely speculates as to the Coopers' view of the original 2007 Leases when the new leases were executed with Anadarko.

A fact finder is free to draw whatever logical inferences it wishes from the evidence. However, on legal sufficiency review, there must be some evidence of probative force—evidence more than a scintilla—underlying those inferences. *Hancock,* 400 S.W.3d at 70–71. Without that evidence, the fact finder's inferences become untenable, and reversal of a judgment for want of legal sufficiency is warranted. *Id.* Here, based on the state of the record before us, the trial court's conclusion that the 2011 Leases were "top leases" as defined by the Participation Agreement did not rest on legally suffi-

cient evidence. As such, Anadarko is entitled to judgment in its favor.

Issue One is sustained.

## CONCLUSION

The judgment of the trial court is reversed, and we render judgment in favor of Anadarko.