Justice Johnson delivered the opinion of the Court.
This case involves a claim by TRO-X, L.P. that it is entitled to a back-in percentage of the working interest in five mineral leases under which Anadarko Petroleum Company is lessee. The trial court agreed with TRO-X, but the court of appeals did not, and reversed. We affirm.
I. Factual and Procedural Background
In early 2007, TRO-X, as lessee, executed mineral leases with David E. Cooper; Hill-Cooper, Ltd.; Richard W. Cooper; Kendall C. Hill; and Shirley Cooper (collectively, the Coopers). These leases (the 2007 Leases) contained identical terms, including a clause that required TRO-X to drill an offset well if an off-lease well was completed within 660 feet of the lease boundaries and produced oil in paying quantities. The 2007 Leases provided that if TRO-X failed to drill an offset well as required, then upon demand of the lessors, TRO-X had to release a specified portion of the leased premises to the Coopers. TRO-X later entered into a participation agreement transferring its interest in the 2007 Leases, with the exception of a contingent reversionary interest, to Eagle Oil *460 & Gas Co. The participation agreement allowed TRO-X to exercise a "back-in" option if Eagle Oil produced minerals from the leases and reached "project payout" as that term was defined in the participation agreement.[1] The back-in provision required 5% of the working interest to be transferred to TRO-X, but only if TRO-X exercised the option. The participation agreement included an "anti-washout" clause. Such a clause is designed to protect an interest like TRO-X's back-in option from being "washed out" by means of the lessee surrendering the lease or allowing it to lapse and then reacquiring the lease without the interest's burden. 8 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW: MANUAL OF OIL AND GAS TERMS 52, 1129 (LexisNexis Matthew Bender 2017) (defining "washout" as the "[e]limination of an overriding royalty or other share of the working interest by the surrender of a lease by a sublessee or assignee and subsequent reacquisition of lease on the same land free of such interest"). TRO-X's anti-washout clause provided that its back-in option "shall extend to and be binding upon any renewal(s), extension(s), or top lease(s) taken within one (1) year of termination of the underlying interest."
Eagle Oil eventually assigned its interest in the 2007 Leases to Anadarko. A year later, Anadarko completed a well on land adjacent to the tract covered by the 2007 Leases and 550 feet from the perimeter. No one disputes that Anadarko failed to drill an offset well within the time frame prescribed by the offset-well clause in the 2007 Leases. On May 25, 2011, Richard W. Cooper sent Anadarko a demand letter asserting that Anadarko had breached the offset well clause by failing to drill an offset well in response to the well drilled on adjacent land. The letter demanded that Anadarko surrender 320 acres of the property covered by the 2007 Leases, as was required by the Leases. After looking into the matter, Anadarko concluded it had indeed breached the offset well clause and that its lease on the acreage Cooper demanded to be surrendered had terminated.
Anadarko then engaged with the Coopers in negotiations that culminated in their executing new leases in June 2011 (the 2011 Leases). The 2011 Leases (1) are between the same parties as the 2007 Leases, (2) cover the same mineral interests that were the subject of the 2007 Leases, (3) contain several terms that vary materially from the 2007 Leases, (4) do not mention either the 2007 Leases or TRO-X's interest under those leases, and (5) do not include language releasing the 2007 Leases. The 2011 Leases specified an effective date of June 17, 2011. The Hill-Cooper, Ltd. 2011 Lease was executed on June 15, 2011. The other four leases were executed after June 17, but before June 30, 2011, when Anadarko executed a written release of all of its interests under the 2007 Leases (the Release) and recorded the 2011 Leases. When TRO-X later approached Anadarko to confirm that its back-in interest in the 2011 Leases was valid, Anadarko denied that it was.
*461 In February 2014, TRO-X sued Anadarko, asserting claims for breach of contract and trespass to try title and seeking a declaratory judgment that the 2011 Leases were top leases and therefore subject to TRO-X's back-in interest. The case was tried non-jury, with the central issue being whether the 2011 Leases were top leases, in which TRO-X retained a back-in interest, or new leases, which washed out TRO-X's interest. The trial court determined that TRO-X owned an undivided 5% working interest pursuant to the participation agreement because the 2007 Leases remained in effect until the Release was executed, making the 2011 Leases top leases. Anadarko appealed, challenging the legal sufficiency of the evidence to support the judgment.
The court of appeals reversed. 511 S.W.3d 778, 786-87 (Tex. App.-El Paso 2016). It noted that TRO-X could prevail only if the 2011 Leases were top leases. Id. at 783-84. The court opined that TRO-X had to prove the Coopers did not intend for the 2011 Leases to terminate the 2007 Leases in order for TRO-X to prevail on its claim that the 2011 Leases were top leases. Id. at 785-86 (citing Sasser v. Dantex Oil & Gas, Inc. , 906 S.W.2d 599, 603 (Tex. App.-San Antonio 1995, writ denied) ). The court concluded that the
resolution of Anadarko's liability under the Participation Agreement hinges on what the Coopers intended to do when they signed the 2011 Leases: Did they intend to terminate whatever remained of the 2007 Leases at the moment the new leases were executed, or did they want to keep the 2007 Leases intact as a failsafe until obtaining a release from Anadarko at the close of the transaction?
Id. (citing Ridge Oil Co. v. Guinn Invs., Inc. , 148 S.W.3d 143, 153 (Tex. 2004) ). The court reviewed the evidence and determined that "[n]othing in the interaction between the parties or in the trial testimony suggests the Coopers intended for the 2011 Leases to be top leases that would come into effect only upon execution of a release." Id. at 786.
In this Court, TRO-X continues to contend that the 2011 Leases are top leases subject to its back-in interest. It asserts that without release language in the 2011 Leases, all the Coopers could convey to Anadarko when the 2011 Leases were executed was an interest in the Coopers' possibility of reverter. According to TRO-X, the 2011 Leases are top leases on their face because they neither make any mention of the 2007 Leases nor contain any indication that Anadarko and the Coopers intended the 2011 Leases to terminate the 2007 Leases. TRO-X argues that it established all it needed to-an existing lease and a subsequent lease taken on those same minerals-and to overcome this evidence, Anadarko was required to establish that the parties intended for the 2011 Leases to terminate the 2007 Leases. TRO-X characterizes Anadarko's requirement as an affirmative defense on which Anadarko had the burden of proof because it was an assertion that, if true, would defeat TRO-X's claim.
Anadarko, however, maintains that for TRO-X to prevail on its breach-of-contract claim it was required to prove each element of its claim, including the existence of a valid contract. That being so, Anadarko argues, the 2011 Leases were burdened by TRO-X's 5% back-in interest only if TRO-X proved the 2011 Leases were intended to be top leases. Anadarko references Ridge Oil for the proposition that parties to an oil and gas lease terminate an existing mineral lease between them if they enter into a new lease with "the intent and understanding that, by doing so, they would effect a release" of the prior lease.
*462 148 S.W.3d at 153 (quoting Sasser , 906 S.W.2d at 603 ). According to Anadarko, the record establishes that both Anadarko and the Coopers intended to release the 2007 Leases by entering into the 2011 Leases, which supplanted the 2007 Leases, and the 2011 Leases contain no language evidencing that either Anadarko or the Coopers intended for the 2011 Leases to be top leases. Anadarko notes that one of the five 2011 Leases was executed before the 2011 Leases' effective date of June 17, 2011, but neither party argues that such fact has any significance as to the issue before us.
II. Law
Mineral leases are contracts and as such are interpreted using the same rules that are applied in interpreting other types of contracts. Tittizer v. Union Gas Corp. , 171 S.W.3d 857, 860 (Tex. 2005). Thus, when construing oil and gas leases, courts "seek the intention of the parties as that intention is expressed in the lease." Sun Oil Co. (Del.) v. Madeley , 626 S.W.2d 726, 727-28 (Tex. 1981). The proper construction of an unambiguous lease is a question of law to be determined by the court de novo. Samson Expl., LLC v. T.S. Reed Props., Inc. , 521 S.W.3d 766, 787 (Tex. 2017) (citing Anadarko Petroleum Corp. v. Thompson , 94 S.W.3d 550, 554 (Tex. 2002) ). Whether a lease is ambiguous is also a question of law for the court. Id. It is only if the court determines that a lease is ambiguous that the parties' interpretations and extraneous evidence may be considered in determining the lease's meaning. David J. Sacks, P.C. v. Haden , 266 S.W.3d 447, 450-51 (Tex. 2008).
III. Discussion
A. Top Leases
As this Court has explained, "Basically, a top lease is a subsequent oil and gas lease which covers one or more mineral interests that are subject to a valid, subsisting prior lease." BP Am. Prod. Co. v. Laddex, Ltd. , 513 S.W.3d 476, 478 n.1 (Tex. 2017) (quoting Michael L. Brown, Effect of Top Leases: Obstruction of Title and Related Considerations , 30 BAYLOR L. REV. 213, 213 (1978) ). Although our basic explanation of what a top lease is did not expressly say so, commentators accept that a top lease becomes effective as to those mineral interests subject to a bottom lease only upon termination of the bottom lease. See, e.g. , NORMAN J. HYNE, DICTIONARY OF PETROLEUM EXPLORATION, DRILLING & PRODUCTION 530 (1991) ("[A top lease is an] oil and gas lease on acreage that currently has a valid lease called the bottom lease. When the bottom lease expires, the top lease becomes effective."); 8 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW: MANUAL OF OIL AND GAS TERMS 1081 (LexisNexis Matthew Bender 2017) (defining top lease as a "lease granted by a landowner during the existence of a recorded mineral lease which is to become effective if and when the existing lease expires or is terminated"); see also 1 ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL AND GAS § 4.5[F] (2d ed. 2015) ("By their nature, top leases delay the new lessee's rights until the termination of an existing lease.").
B. Termination of the 2007 Leases
Anadarko urges that the different leases did not exist at the same time, and the 2011 Leases were not contingent on expiration or termination of the 2007 Leases because execution of the 2011 Leases terminated the 2007 Leases. Thus, the 2011 Leases were not top leases.
TRO-X responds that under Texas law, predecessor existing leases, such as the 2007 Leases, remain effective absent discrete evidence of intent to terminate them.
*463 As explained below, we agree with Anadarko.
In Ridge Oil , we recognized that "[e]ven if an oil and gas lease does not contain a surrender clause, the parties may mutually agree to a release, or they effectively terminate their lease by signing a new one ." Ridge Oil , 148 S.W.3d at 152-53 (emphasis added) (citing Sasser , 906 S.W.2d at 603 ); Sasser , 906 S.W.2d at 603 ("We ... hold that, by signing a new lease with the intent to terminate a prior lease, a lessor waives strict compliance with a surrender clause and effectively terminates or releases the prior lease."). In Ridge Oil , the lessee ceased production while operating under an existing lease, then entered into new leases with its lessors. Ridge Oil , 148 S.W.3d at 148. The Court held that "[w]hen the owners of the possibility of reverter of the mineral interest in the [land] executed new leases with [the lessee], they effectively terminated the [previous] lease as to that [land]. Production by [the lessee] was thereafter performed under the new ... leases, not the [previous] lease." Id. at 153. Although in the discussion of background facts the Court mentioned extrinsic evidence indicating the parties intended the new leases to terminate the previous ones, it did not discuss this evidence in analyzing whether the execution of the subsequent leases terminated the previous leases. See id. at 148, 152-53. Instead, the Court based its conclusion that the previous leases had been terminated solely on the fact that the parties executed new leases of the same mineral interests before production resumed. See id. at 152-53.
TRO-X observes that the Ridge Oil opinion cited Sasser , which TRO-X claims stands for the proposition that a subsequent lease cannot terminate a previous lease without evidence that the parties intended to do so: "[B]y signing a new lease with the intent to terminate a prior lease , a lessor waives strict compliance with a surrender clause and effectively terminates or releases the prior lease." Id. at 153 n.34 (emphasis added) (quoting Sasser , 906 S.W.2d at 603 ).
We disagree with TRO-X that in order for a new lease between the parties to an existing lease to terminate that lease, the new lease must contain specific language showing that the parties intended for execution of the new lease to terminate the prior lease. To clarify what we explained in Ridge Oil , if necessary, an existing lease between the parties as to an interest terminates when the parties enter into a new lease covering that interest unless the new lease objectively demonstrates that both parties intended for the new lease not to terminate the prior lease between them. See id. at 152-53 (stating that execution of the lease effected termination of the prior lease without basing that conclusion on evidence outside the lease that the parties intended to terminate the prior leases by entering into new ones). Such intent might be reflected, for example, by language making the new lease subject to the existing lease or limiting the grant to a different interest than was conveyed by the prior lease.
TRO-X also relies on another passage of Sasser that Ridge Oil quotes: "[T]he 1974 Lease terminated when Dantex and [the owner of the possibility of reverter] signed the 1990 Lease with the intent and understanding that, by doing so, they would effect a release of the 1974 Lease." Id. at 153 (second alteration in original) (quoting Sasser , 906 S.W.2d at 603 ). However, in Ridge Oil , the Court did not rely on this language in determining that the new lease terminated the old one. See ids="10013229" index="25" url="https://cite.case.law/sw2d/906/599/#p603">id. Instead, this quote appeared in the Court's discussion of "alleged 'washout[s]' " and "[o]ther decisions [that] recognize, in the overriding *464 royalty context, that a lessee may terminate a lease and extinguish the overriding royalty interest, at least when the lease has an express surrender clause." See id. at 153-55. Moreover, the Court's decision in Ridge Oil did not turn on the Sasser court's having based its decision on affidavits concerning the parties' understanding that the new leases constituted a release of the old leases. See id. at 152-53 ; Sasser , 906 S.W.2d at 602, 604.
Both Anadarko and TRO-X are somewhat inconsistent in their positions regarding whose intent-that of the lessor, the lessee, or both-matters. This may result from the fact that in Ridge Oil we said "parties," whereas in Sasser , the court of appeals appeared to, at times, devote more attention to the lessor's intent. Compare Ridge Oil , 148 S.W.3d at 152-53 ("Even if an oil and gas lease does not contain a surrender clause, the parties may mutually agree to a release, or they can effectively terminate their lease by signing a new one." (emphasis added) ), and Sasser , 906 S.W.2d at 604 (basing its conclusion on evidence of intent of both the lessor and lessee), with Sasser , 906 S.W.2d at 603 ("[B]y signing a new lease with the intent to terminate a prior lease, a lessor waives strict compliance with a surrender clause and effectively terminates or releases the prior lease." (emphasis added) ). To clarify, it is the intent of both parties, not just that of the lessor, that is relevant. See Shell Oil Co. v. Stansbury , 401 S.W.2d 623 (Tex. Civ. App.-Beaumont 1966), writ ref'd n.r.e., 410 S.W.2d 187 (Tex. 1966) (recognizing that a lessor and lessee can effect a limited release by "mutual agreement").
In sum, when a lessor and lessee under an existing lease execute a new lease of the same mineral interests subject to the existing lease, the existing lease is terminated unless the new lease objectively demonstrates both parties' intent otherwise-for example, by language in the new lease making it subject or subordinate to the prior lease, or restricting the new lease's grant or limiting the grant to a different interest from that conveyed by the prior lease. A party contending that a new lease did not terminate the previous one has the burden to prove and obtain a finding that the parties intended for the previous lease to survive execution of the new lease. The proof must be either specific language in the new lease objectively demonstrating that intent, or an ambiguity in the new lease as to termination of the previous lease together with evidence that the parties did not intend the new lease to terminate the prior lease.
C. Burden of Proof
TRO-X faults the court of appeals for allocating to it the burden of proof with respect to whether the parties intended the 2011 Leases to terminate the 2007 Leases. According to TRO-X, it proved all that it needed to-the 2007 Leases were in effect when the 2011 Leases were executed. TRO-X contends that Anadarko's position-although the 2007 Leases were in effect when the 2011 Leases were executed, the 2011 Leases terminated the 2007 Leases-is properly characterized as an affirmative defense; thus, the court of appeals erred in placing the burden of proof regarding the parties' intent on TRO-X. Anadarko responds that TRO-X, as the plaintiff in a breach-of-contract action, has the burden of proving every element of its claim, including the existence of a valid contract that was burdened by its back-in working interest.
We agree with Anadarko that the court of appeals properly placed the burden of proof on TRO-X: "It is [a] well accepted postulate of the common law that a civil litigant who asserts an affirmative claim for relief has the burden to persuade *465 the finder of fact of the existence of each element of his cause of action." Vance v. My Apartment Steak House of San Antonio, Inc. , 677 S.W.2d 480, 482 (Tex. 1984). That includes proving the existence of a valid contract in a breach of contract case. See T.O. Stanley Boot Co. v. Bank of El Paso , 847 S.W.2d 218, 221 (Tex. 1992) (holding that the plaintiff's breach of contract claim failed because there was no evidence of a legally binding, valid contract). An affirmative defense, on which the defendant has the burden to prove and obtaining findings supporting its position, is comprised of "facts and arguments that, if true, will defeat the plaintiff's ... claim, even if all the allegations in the complaint are true." Zorrilla v. Aypco Constr. II, LLC , 469 S.W.3d 143, 155-56 (Tex. 2015) (quoting Affirmative Defense , BLACK'S LAW DICTIONARY (10th ed. 2009) ).
Under the participation agreement's anti-washout clause, TRO-X's back-in interest survived as a burden on the 2011 Leases only if the 2011 Leases constituted extensions, renewals, or top leases. As noted previously, TRO-X does not argue that the 2011 Leases were extensions or renewals-only that they were top leases. So if those leases were not top leases, TRO-X did not have valid rights in them and Anadarko did not breach the participation agreement by refusing to recognize TRO-X's claimed back-in interest. Accordingly, whether the 2011 Leases were top leases is a question constituting part of TRO-X's claim that it had valid contractual rights in the 2011 Leases; whether they were is not an affirmative defense.
D. Application
The 2011 Leases did not contain language evidencing the intent of the parties that the Coopers were conveying any less interest to Anadarko than they conveyed in the 2007 Leases. And TRO-X does not point to language in the 2011 Leases indicating that Anadarko and the Coopers intended for the 2007 Leases to survive the 2011 Leases' execution. Thus, the 2007 Leases were terminated by the 2011 Leases.
TRO-X argues that even if the 2011 Leases terminated the 2007 Leases, the leases necessarily existed at the same time because the 2011 Leases had to exist to revoke the 2007 Leases. Therefore, according to TRO-X, because all the Lessors had to convey at the time the 2011 Leases were executed was a possibility of reverter, the 2011 Leases are top leases. As TRO-X asserted during oral arguments, its position is analogous to the due-order-of-pleading rule for special appearances and motions to transfer venue. See TEX. R. CIV. P. 86(1) (requiring that an objection to improper venue be filed before or concurrently with any other plea, pleading, or motion except for a special appearance); TEX. R. CIV. P. 120a (mandating that a special appearance be filed before any other plea, pleading, or motion but providing that a special appearance may be contained in the same instrument without waiver of such special appearance). Essentially, TRO-X's position is that unless a release of an existing lease is executed before a new, subsequent lease is executed, or unless the new lease contains release language preceding the rest of the document, the new lease and the previous lease exist at the same time. And if the two leases exist at the same time, regardless of the length of the time overlap, and the new lease becomes effective upon termination of the preexisting lease, then the new lease is a top lease. According to Anadarko, however, for a new lease to be a top lease it must coexist with the previous lease for more than some infinitesimal length of time, as TRO-X would have it.
*466 We need not determine whether an infinitesimal overlap of the 2007 and 2011 Leases would cause the 2011 Leases to be classified as top leases because we disagree that TRO-X established that the 2007 Leases existed at the same time as the 2011 Leases, even for a short time. Because TRO-X has not identified any language evidencing that Anadarko and the Coopers intended for the two sets of leases to coexist for any amount of time, the 2007 Leases were terminated by the parties' execution of the 2011 Leases. And while one 2011 Lease became effective two days after it was executed, neither party argues that its effect is different from that of the four leases that were executed after their effective date. Accordingly, TRO-X failed to show an overlap ever existed between the 2007 Leases and the 2011 Leases. See Ridge Oil , 148 S.W.3d at 152-53.
TRO-X argues that the fact Anadarko executed and recorded the written Release of the 2007 Leases after executing the 2011 Leases is evidence that Anadarko and the Coopers did not intend for the 2007 Leases to be terminated by their execution of the 2011 Leases, but rather intended the 2007 Leases to continue in force until terminated by the Release. Anadarko similarly relies on extrinsic evidence by referencing correspondence between its representative and the Coopers' representative indicating the parties intended for the 2011 Leases to terminate the 2007 Leases. But absent ambiguity in the 2011 Leases, we do not look beyond their four corners for evidence of the parties' intent. See Haden , 266 S.W.3d at 450-51 ("Only where a contract is ambiguous may a court consider the parties' interpretation and 'admit extraneous evidence to determine the true meaning of the instrument.' " (quoting Nat'l Union Fire Ins. Co. v. CBI Indus., Inc. , 907 S.W.2d 517, 520 (Tex. 1995) ) ). Because the 2011 Leases are not ambiguous, when interpreting them we do not go outside their four corners and consider evidence like the Release Anadarko later executed or the correspondence Anadarko references. See Thompson , 94 S.W.3d at 554 ("In construing an unambiguous lease, our primary duty is to ascertain the parties' intent as expressed within the lease's four corners.").
IV. Conclusion
The 2011 Leases are not top leases subject to TRO-X's back-in interest. Accordingly, we affirm the court of appeals' judgment.

The participation agreement defined "project payout" as
the first point in time when the proceeds of all production from all operations conducted on the Contract Acreage (exclusive of royalty, overriding royalty and taxes chargeable to the working interest), up to the time of Project Payout, equals the actual cost incurred by the Operator in land, title opinion and curative costs and in surveying, building location, preparing to drill, drilling, testing, equipping, gathering and pipeline cost and the cost of operating the well(s), inclusive of overhead charges as defined in the Copas attached to a [joint operating agreement], and further including prospect acquisition costs of $241,000.